## THE JULIA FOWLER.

### HANSEN v. THE JULIA FOWLER.

*(District Court, S. D. New York. January 23, 1892.)*

PERSONAL INJURIES—DEFECTIVE ROPE—KNOWLEDGE OF MATE OF VESSEL—ACQUIESCENCE OF SAILOR.

While libelant, a seaman, was employed in scraping the mainmast of the Julia Fowler, on a triangle surrounding the mast, the rope holding the triangle broke, precipitating libelant to the deck, and causing injuries, to recover for which this suit was brought. The evidence showed that the rope was old and spliced, and that the attention of the mate, who rigged the triangle and was in charge of the work, had been called to its character before the accident. It also appeared that all the men considered the rope of doubtful sufficiency, but that they continued the work without objection, without demanding a new rope, and there was no evidence to show a new one would not have been furnished them had they asked for it. *Held*, that this was an acquiescence in the wrongful act of the mate, charging libelant also with negligence. Four hundred dollars damages awarded.

In Admiralty. Libel by Frank S. Hansen against the schooner Julia Fowler for personal injuries. Decree for libelant.

*Carpenter & Mosher*, for libelant.

*Henry D. Hotchkiss*, for claimant.

BROWN, District Judge. On the 7th of August, 1891, the libelant, a seaman on board the Julia Fowler, was at work with two others scraping the mainmast on the triangular frame-work of wood surrounding the mast, which had been rigged up by the mate of the vessel for them to sit on while at work. One side of the triangle was held by the end of the main throat-halliard, which gave way while the libelant was at work, so that he fell upon the deck and suffered injuries which up to the present time have disabled him from work. The above libel is filed to recover his damages, alleging negligence in that the halliard was known to be unfit for the purpose.

The evidence shows that the triangle was rigged up under the immediate direction and inspection of the mate; that the halliard was broken at a splice; that it had not been used for the same purpose before, and was unfit and insufficient to support the three men who were sent to work in the triangle in the way that it was rigged, namely, to sustain the triangle by a single line, or purchase, instead of having the line rove through the three sheaves of the block above, and the two sheaves of a block below, which would have divided the weight among five parts or purchases of the same line. The master, who at the time

was sick below, states that the line would have been sufficient had it been rigged in the latter way; and that the latter was the proper and usual mode of rigging the triangle, though it is sometimes done in the mode used in this case. The mate's statement that he had never seen any other mode used at sea makes me discredit his testimony on all controverted points.

It is plain that the mate was negligent in the performance of his duties in the use of such a line to rig the triangle in that manner. He ordered the use of this particular rope, and superintended the rigging of it. The defect in the line was manifest upon inspection, as it was spliced, and whipped for smooth running. The negligence of the master, or chief officer who acts in the master's place, to provide safe appliances for the use of the seamen, and the deliberate use of rigging or methods plainly unsafe, affects both ship and owners with liability for the consequent damage. The chief officer was not acting in the mere capacity of a fellow-laborer, as in *Quinn* v. *Lighterage Co.*, 23 Fed. Rep. 363; *The Queen*, 40 Fed. Rep. 694, 697; *Hedley* v. *Pinkney*, (1892,) 1 Q. B. 58. The case is substantially the same as that of *The A. Heaton*, 43 Fed. Rep. 592, in which this rule was applied in respect to the use of a rotten gasket. See, also, *The Frank and Willie*, 45 Fed. Rep. 494. The libelant had nothing to do with preparing or rigging the triangle; but when it was ready, he was ordered aloft to work upon it, and obeyed.

In defense it is urged that not long after the libelant and his companions had begun work aloft, and while he was sitting in the triangle, the mate noticed from the deck that the rope was defective, and called the attention of the men to it, and asked Hansen if the rope was secure, and said that he did not like the looks of it; that the libelant thereupon examined the rope, and replied that it looked all right; and that the men continued at work for a half hour afterwards before the halliard broke. I do not credit this version, but that of the men, who say that Hansen's reply was in effect that it was a mighty poor rope for such work; and the weight of evidence on this point, notwithstanding the fact that the libelant does not remember his language, is that he further suggested that they hurry on, so that if they fell, they would have a less distance to fall. Does that fact release the mate and ship from the consequence of their prior negligence, and transfer the whole risk thenceforth to the seamen? I think not. The men were neither told to come down, nor does the mate say that he authorized the men to come down, if they thought the rope insufficient. The men testify that what the mate said was, "Look out boys; that is a poor rope." The direction amounted to little if anything more than to be cautious in their work and movements, so as not to make any unnecessary strain upon the rope. The insufficiency arose not merely from the splice, but in adjusting the rope with a single bearing. The evidence leaves no doubt, however, that all the men considered the rope of doubtful sufficiency, and that they would have been justified in demanding another rope, or a readjustment of it in a safe manner; but that they continued to work without objec-

tion. Nor can I find that, if a proper rope or readjustment had been asked by them, it would not have been allowed. I do not see how I can hold this to be less than acquiescence by them in the wrongful act of the mate, such as to charge the men also with negligence or want of reasonable care. The case falls, therefore, within the principles of *The Max Morris*, 137 U. S. 1, 11 Sup. Ct. Rep. 29, 24 Fed. Rep. 860. Though the libelant is yet far from well, his ultimate recovery, upon the evidence, seems probable. I allow him $400, and costs.