ROCHEFORT v. TECHE LINES, Inc., et al.*

No. 17010.

Court of Appeal of Louisiana. Orleans.

Feb. 27, 1939.

Hugh M. Wilkinson, A. Miles Coe, and John D. Lambert, all of New Orleans, for appellant.

Porteous, Johnson & Humphrey, of New Orleans, for appellees.

WESTERFIELD, Judge.

This is a suit for property damage and physical injuries resulting from a colli-

sion between a passenger omnibus owned by the defendant Teche Lines, Inc., and, at the time of the accident, driven by one of its employees, and a DeSoto automobile owned and driven by the plaintiff, Frank Rochefort. The accident occurred on July 7th, 1936, and suit was brought against the Teche Lines, Inc., and its insurance carrier, the Central Surety & Insurance Corporation of Kansas City, Missouri, for $63,-209.20, on April 29th, 1937.

From an adverse judgment plaintiff has appealed.

The vehicles collided in the intersection of St. Louis Street and N. Claiborne Avenue when plaintiff's automobile, which was being driven on Claiborne Avenue in the direction of Esplanade Avenue, was struck by the defendant's bus which entered the intersection from St. Louis Street, which crosses Claiborne Avenue at right angles. The driver of the bus, for whose negligence his employer is vicariously liable, is said to have been at fault because of excessive speed, failure to respect the "stop" sign or to sound horn on approaching the intersection; the employer is said to have been primarily negligent due to its failure to have the bus equipped with proper brakes in accordance with Act 21 of 1932, and in operating an old and unsafe bus without proper inspection. Both defendants joined in the same answer and admitted that the accident happened at the time and place as alleged by plaintiff and also that the bus driver did not stop for the intersection, but denied responsibility upon the ground that there was a latent or concealed mechanical defect in the brakes. In the alternative, the defendants pleaded contributory negligence averring that plaintiff was exceeding the speed limit as established by the City Traffic Ordinance, and was not keeping a proper lookout and, finally, that plaintiff had the last clear chance of avoiding the accident.

North Claiborne Avenue is a wide thoroughfare divided by a neutral ground. It measures from curb to curb one hundred sixty-eight feet, eight inches. The neutral ground is one hundred seventeen feet, five inches wide, and the roadway on each side, which is restricted to one-way traffic, is approximately twenty-five feet wide. Plaintiff's automobile approached the intersection on the side nearest the defendant's bus since it was going in the direction of traffic to which that side of the thoroughfare is devoted. St. Louis Street is relatively narrow, being only twenty-nine feet, five inches wide.

M. J. Bouvier, the driver of the bus, testified that he had been working for the defendant for twelve years; that on the day of the accident, he left the Rampart Street Garage and drove down Rampart Street to St. Louis Street; that he stopped for a traffic sign at the intersection of Basin and St. Louis Streets and then drove out St. Louis Street until within one hundred and fifty feet of St. Louis Street and Claiborne Avenue, when he applied his foot brakes which held for a moment and then "let go"; that his speed was between twenty and twenty-five miles per hour; that he had one passenger in the bus and he "told him something had gone wrong and I cannot stop and as I approached the intersection, about thirty feet I pulled back the emergency brake and blew my horn and turned to the right, thinking the other car would see me and turn to his left, which he did not and we collided and I went up on the neutral ground and struck a tree". This evidence he subsequently qualified on cross-examination by retracting his statement that he had blown his horn and by changing his testimony with respect to the distance from the intersection when he first attempted to apply the brakes from one hundred and fifty feet to three hundred feet.

The defective brake with which the bus was equipped was removed from the bus after the accident and a part of it introduced in evidence and exhibited in this Court. Many witnesses were sworn and much testimony elicited in connection with the alleged hidden defect. We are not sure we understand the mechanics involved in the operation of the brakes, notwithstanding the elaborate explanation of counsel in brief and in argument. It appears, however, that a certain nut called a "lock nut" is attached to the brake rod and that when this "lock nut" is kept tight against the "adapter", all is well, but when allowed to work loose the vibration wears the threads and, in time, causes the brake rod to separate with the result that the brakes will not function.

B. J. LeBlanc, Professor of Mechanical Arts and Metallurgy at Tulane University, testified for defendant and declared that in his opinion the metal which composed the "lock nut" and the "brake rod" was defective and that the threads on the nut were poorly executed. Professor LeBlanc had

photographed the nut and brake rod after having magnified the objects five hundred times. Other witnesses, for example, E. Q. Chaney, the New Orleans Manager of the Mack Truck Company, the concern which had manufactured the bus operated by defendant, and John Scarpero, the local service manager of the Mack Company, testified that they had never known one of the brake rods on a Mack Truck to pull out before.

■■ The bus, which is numbered 164, had been inspected by the mechanics of the Teche Lines, Inc., on July 6th, 1936, the day before the accident. The inspection included the brake rods and the lock nuts and was performed by having a man seated at the steering wheel working the brakes and one underneath the vehicle examining their application. Without mentioning any further details of the evidence on this subject, which is largely cumulative, we are of opinion that its sum and substance falls far short of establishing the defense based upon a latent defect. In the first place, the bus was, at the time of the accident, six years old. It was one of ten busses purchased from an insolvent corporation in St. Louis, Mo., for $6,000 or $600 each, the original price of one bus being $15,000. If the brake rod and lock nut, which were introduced in evidence, were the original appliances installed by the manufacturer in 1930, and were as defective in material and workmanship as defendant would have us believe, we find it difficult to understand why the bus should have given such long service without having previously revealed its inherent defect by the failure of the brake to function long before the date of the accident under consideration. Moreover, we get the impression from the evidence that if this "lock nut" had been securely tightened the brake rod could not have worked loose, notwithstanding the fact that some of the threads were worn. The metal of which the parts of the brakes were constructed, whether inferior or not, did not separate and the only effect of the alleged inferior composition is that it caused the threads of the nut to wear. When it is considered that in the twenty months, during which time this bus was in the service of the defendant, it traveled thousands of miles and on the day of the accident it had just returned from a trip to Raceland over very rough roads, the worn threads might very well have been due to ordinary wear and tear. If the nut was in proper position when the bus left the garage on Rampart Street, it is difficult to understand why it should have loosened and the brake rod pulled out when on St. Louis Street approximately eight city blocks distant. On the whole, we are unable to say that the failure of the foot brake to function was due to a defect which might not have been discovered as a result of careful examination and inspection, but if we are mistaken in this regard, we are convinced of the negligence of the driver of defendant's bus and of the defendant Teche Lines, Inc., in other respects.

Bouvier admits that he was running between twenty and twenty-five miles per hour. Other witnesses place his speed between thirty and thirty-five miles per hour, but in any event he was exceeding the speed limit. St. Louis Street, in the vicinity of North Claiborne Avenue, is a "business district" as defined by the Traffic Ordinance No. 13,702 C.C.S., and the speed of all vehicles is limited to fifteen miles per hour. When Bouvier first discovered that his foot brake would not work, he was between one hundred and fifty and three hundred feet (he gives both estimates) from Claiborne Avenue. He says that the brakes held for only a moment and then collapsed. He did not attempt to apply his emergency brake until thirty feet from the intersection. In the meanwhile, he was working the pedals in an effort to get the foot brakes to hold. He should have immediately attempted to apply the hand or emergency brake and not wait until within thirty feet of the corner to do so. It is doubtful whether he ever attempted to use the emergency brake, for after the accident the hand lever attached to the brake was not drawn up and held in place by the ratchet as it would have been if the brake had been used, but if he did it had little effect, for when the bus finally came to rest on the neutral ground against a tree after striking the plaintiff's automobile, it had traveled at least one hundred and eighty-five feet from the point where Bouvier claims to have applied the brake. In fact, it is conceded that the emergency brake was not effective as a means of stopping the bus in an emergency. After the accident, a series of tests were conducted with a similar bus, under the supervision of defendants' counsel, as a result of which it appears that by the use of the emergency

or hand brake alone, the bus, when traveling at twenty-five miles per hour, could not be stopped within less than three hundred and forty-two feet. A witness by the name of Fridge, employed as a mechanic by the White Motor Company, testified that its busses (defendant had several White busses) could not be stopped under four hundred and eighty-six feet, under similar circumstances. Counsel argue that defendant is under no obligation to equip its busses with emergency brakes which will stop them, the purpose of such brakes being to hold the bus after it is stopped. In other words, a "parking brake". Reference is made to the Motor Carriers' Safety Regulations of the Interstate Commerce Commission. Rule 4 B (5) requires that "means to be provided by which motor vehicles of all types shall be capable of being held stationary on any up or down grade upon which they may be operated. The rule recognizes the fact that the hand brake on modern motor vehicles, considering the improvement in design and effectiveness of the service brake, is now designed principally for the purpose of holding the vehicle rather than stopping it". Opposing counsel call our attention to the fact that the rule referred to was not effective until July 1st, 1937, or one year after the accident which forms the basis of this suit occurred, and to the further fact that in the same pamphlet in which these rules are published, there appears under the title of "Motor Carrier Act of 1935", the following:

"Section B. Brakes. 1. Every bus, truck and truck tractor shall be equipped with brakes adequate to control the movement of, and to stop and to hold, such vehicle, including two separate means of applying the brakes. If these two separate means of applying the brakes are connected in anyway, they shall be so constructed that failure of any one part of the operating mechanism shall not leave the vehicle without brakes adequate to stop and to hold such vehicle."

Be that as it may, however, Act 21 of 1932, Title 3, Section 9 (a), requires motor vehicles operated in this State to be equipped with two brake systems each of which must be adequate to stop as well as to hold the vehicle when stopped. It reads:

"Section 9. (Equipment). (a) (Brakes).

"1. Every motor vehicle, other than a motorcycle, when operated upon a public road, highway or bridge of this State, shall be equipped with brakes adequate to control the movement of and to stop and hold such vehicle, including two separate means of applying the brakes, each of which means shall be effective to apply the brakes to at least two wheels. If these two separate means of applying the brakes are connected in any way, they shall be so constructed that failure of any one part of the operating mechanism shall not leave the motor vehicle without brakes on at least two wheels."

It seems clear to us that the purpose of the Legislature, as expressed in the quoted provision, was to provide two separate means of stopping motor vehicles in order to increase the margin of safety.

In a case cited by counsel for plaintiff, People v. Cicardo, 140 Misc. 332, 250 N.Y. S. 477, a provision of the New York Statute required "every motor vehicle driven on public highways of state to be provided with adequate brakes in good working order and sufficient to control such vehicle at all times when same is in use". Vehicle and Traffic Law N.Y. § 15, subd. 1, as amended by Laws 1930, c. 576. It was argued there, as it is here, that the failure to have an emergency brake which would stop an automobile did not violate the statute since the car was equipped with an adequate foot brake. This view, it was contended, was supported by another provision of the New York Statute, to the effect that the "driver of a vehicle shall apply the emergency brakes before leaving the same unattended on any public highway. * * *" Section 87, subd. 3. The Court, however, said:

"The word 'emergency' is defined in the Standard Dictionary as follows: 'A sudden or unexpected occurrence or condition calling for immediate action.' The emergency brake (as the name implies) is for the purpose of bringing the car to a stop in a sudden or unexpected occurrence or condition, to be used in addition to the foot brake and also in case the foot brake should be out of order or unable to bring the car to a stop."

Referring to counsel's contention that the emergency brake was intended only for parking purposes, the Court said:

"The contention that, as defendant's car was equipped with an adequate foot brake, he did not violate the statute because his emergency brake was not in good condition, is untenable. The statute reads:

'Brakes' plural not 'brake' singular. If it were the intention of the Legislature to use the word 'brake' singular, it could very easily have said that every motor vehicle operated or driven upon the public highways of the state shall be provided with an adequate foot brake (or an adequate emergency brake) in good working order and sufficient to control such vehicle at all times while in use. This the Legislature did not do, and in my opinion the statute means just what it says, that the brakes of the motor vehicle must be adequate, which means that both the foot brake and the emergency brake must be in good working order and sufficient to control the car at all times when in use."

In Babbitt's Motor Vehicle Law, 4th Ed., Section 406, Page 279, we read:

"Statutes governing the brakes and other equipment are usual in this country, and a statute requiring adequate brakes is applicable to an automobile on the highway, whether it is stopped or is in motion, but is primarily applicable to vehicles run on the highway. An inadequate emergency brake violates a statute requiring adequate brakes, notwithstanding the existence of an adequate foot brake. The term 'good and sufficient brakes' as used in these statutes means brakes adequate to promptly check and slacken the speed of the vehicle and bring it to a complete stop. Where the statute requires that an automobile be equipped with an 'efficient' brake, an instruction that failure to have a 'good and sufficient' brake is negligence is not error, as 'sufficient' is practically synonymous with 'efficient' * * *."

See, also, Ziskovsky v. Miller, 120 Neb. 255, 231 N.W. 809; Foster v. Farra, 117 Or. 286, 243 P. 778; Vedder v. Bireley, 92 Cal.App. 52, 267 P. 724; Gilmore v. Caswell, 65 Cal.App. 299, 224 P. 249; Phillips v. Pickwick Stages, 85 Cal.App. 571, 259 P. 968; Plannett v. McFall, Mo.App., 284 S.W. 850; Marks v. Stolts, 165 App. Div. 462, 150 N.Y.S. 952; Orange Crush Bottling Co. v. Smith, 35 Ga.App. 92, 132 S.E. 259.

 .The Louisiana Statute requires that every motor vehicle shall be equipped with two separate means of applying the brakes "each of which means shall be effective" and that the brakes shall be "adequate to control the movement of and to stop and to hold such vehicle". It seems to us too clear for argument that the Legislature intended that two separate brakes, both of which should be efficient and capable of stopping a car, should be part of the equipment of every motor vehicle, so that in case one brake, let us say the footbrake, should fail, the other brake, the hand or emergency brake, might control the car. It is suggested in argument and in brief and to some extent supported by the record that defendant's bus, No. 164, was no different than other busses of standard manufacture with respect to the efficiency of its emergency brake. This may be true, but if so, all such busses fail to observe the provisions of the Louisiana Statute on the subject. To say that a brake which cannot stop a motor vehicle when running at the moderate rate of twenty-five miles per hour in less than three hundred and forty-two feet is "adequate to control the movement of and to stop and to hold" it, is absurd on its face. The idea that the hand brake is only a parking brake is probably suggested by the fact that it is the only brake which can be applied when the vehicle is stationary or parked, since it is equipped with a ratchet which maintains the equipment attached to the braking surface taut, whereas the foot brake is relaxed when not actually under pressure of the foot of the driver. But, however the idea may have originated, or whatever may be the custom of the manufacturers of busses, the statute is plain and finds most appropriate application to the present situation where a bus weighing between sixteen and twenty thousand pounds is operated on the city streets. The capacity of such a vehicle for damage to life and property is enormous and the necessity for its equipment with all practical means of control obvious.

 The contributory negligence imputed to plaintiff by defendant finds no support in the record. This defense was apparently abandoned since it was neither briefed nor argued. In any event it is without merit.

 The plaintiff was very seriously injured. He suffered a linear fracture at the base of the skull and four broken ribs. He was in the hospital twenty-five days. His medical expenses, including doctors' fees, nurses, hospitalization and drugs, amounted to $2,777.34. The damage to his automobile amounted to $149.50. There is much difference of opinion among the doctors whose testimony is in the record concerning the permanent results of the injuries which Rochefort sustained. Doctors

Holbrook, Jacobs and Robbins, testifying for plaintiff, believed him to be totally and permanently incapacitated and that he has suffered and still suffers from a very serious injury to his brain which might cause epilepsy or induce suicide. They also thought that he was incompetent to testify in the case and Rochefort did not take the stand. Doctors Unsworth, Penick, Oakley and Fenno, on behalf of defendant, testified with more or less conviction that Rochefort was shamming, but all of these physicians declared that they would not trust him to fill one of their prescriptions. (Rochefort is a pharmacist.) On the question of permanent injury, the truth, we believe, lies somewhere between the two extremes of medical opinion. We are not convinced that Rochefort is a malingerer, but we believe the saga of his injuries has lost nothing in its recital. His wife, for instance, testified that he had lost his previously well-developed sexual virility, but she did not undertake to say that this unfortunate condition would be permanent and, of course, she could not do so. Nor could she trace the causal connection. He was fifty-six years old at the time of the accident and was earning $3,000 a year as a pharmacist. Since the accident he has done little or nothing in connection with his business. Fortunately, his wife is able to carry on and earn a living for both of them. For all items of damage claimed, we will allow $17,500.

■ The amount of the policy covering bus No. 164 issued by the defendant insurance company is $5,000. Plaintiff's counsel contend that regardless of this fact the bond must be considered as though the amount were $30,000. They cite Act 292 of 1926 which requires transportation companies similar to the defendant to file "with the [Louisiana Public Service] Commission a liability insurance policy or bond * * * in the amount of five thousand ($5,000.00) dollars on each * * * vehicle [bus] * * * having a seating capacity of not more than seven (7) passengers, and thirty thousand ($30,000.00) dollars on each * * * vehicle [bus] having a seating capacity of more than seven (7) passengers; the said policy or bond running in favor of any person, who may sustain personal injury * * *". Section 6. Since the bus involved in the accident had a seating capacity of twenty-five persons, the policy should have been written for $30,000 and, according to counsel, must

be considered as if it had. The argument in this regard proceeds upon the theory that the policy or bond is statutory and may be likened to a judicial bond and that the Public Service Commission had no authority to accept the bond for less than that authorized by law and the effect of its doing so is to read into the policy the statutory requirements. They quote from Slocomb et al. v. Robert, 16 La. 173, 174, decided in 1840, as follows:

"The appellants' counsel has contended, that the conditions of this bond vary from those of the bond required by the Code of Practice, which provides for the discharge of the surety, on surrendering the principal. The condition of the latter bond is: 'That the defendant shall not depart the state, or leave the jurisdiction of the court; and that he shall appear to answer to the judgment.' Code of Practice, 230. It has been urged, that we have often said: 'In whatsoever manner a man binds himself, he shall remain bound.' This may be true in mere conventional obligations, but not in judicial bonds taken by the sheriff from persons in his custody. In such a case, the sheriff has no power to take any other bond but that which he is authorized by law to take. Any clause which is superadded must be rejected, and any that is omitted supplied."

See, also, Baker v. Morrison, 4 La.Ann. 372; St. Charles Street Railway Company v. Fidelity & Deposit Company, 109 La. 491, 498, 33 So. 574; Board of Commissioners v. Howard Land & Timber Company, 132 La. 911, 61 So. 868.

We do not believe the analogy sought to be drawn between this case and the judicial and statutory bond can be maintained. It is one thing to enlarge upon or contract the terms of a bond or policy issued in compliance with a statute so as to increase or diminish the coverage in accordance with the terms of the statute, but quite another to increase the amount of the bond beyond that contracted for. In this case the surety company contracted for a policy of $5,000. If that bond was insufficient, when presented to the Louisiana Public Service Commission, it should have been rejected and the proper bond insisted upon. Since that was not done we cannot say that the penalty for the failure to comply with the statute shall be visited upon the surety by increasing the amount of its liability to the amount which it should have been, had the policy been such as the law

requires from its policyholder the Teche Lines, Inc.

The judgment, therefore, shall be in solido, against both defendants up to the sum of $5,000, and against the Teche Lines, Inc., for the full amount.

For the reasons assigned the judgment appealed from is annulled, avoided and reversed, and it is now ordered that there be judgment herein in favor of the plaintiff, Frank Santo Rochefort, and against the defendants, Teche Lines, Inc., and Central Surety and Insurance Corporation of Kansas City, Missouri, in solido, in the sum of Five Thousand ($5,000) Dollars; and further judgment against the Teche Lines, Inc., in the sum of Twelve Thousand Five Hundred ($12,500) Dollars.

Reversed.

*Rehearing denied March 27, 1939.