For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.

**3 So.2d 632**

**FEGAN v. LYKES BROS. S. S. CO., Inc.**

**No. 36190.**

June 30, 1941.

Rehearing Denied July 18, 1941.

B. Y. Wolf, of New Orleans, for applicant.

Terriberry, Young, Rault & Carroll and Andrew R. Martinez, all of New Orleans, for respondents.

HIGGINS, Justice.

The plaintiff, first mate on the steamship West Tacock, sued the owners of the ship, under the Jones Act, 46 U.S.C.A. § 688, to recover damages for personal injuries alleged to have been sustained through the defendant's negligence in failing to provide a safe place to work and safe appliances with which to perform his duties. He also seeks recovery under his maritime contract of employment for maintenance and cure. He alleged that he was seriously injured on May 13, 1938, as a result of firing a Lyle gun or cannon, upon orders of the master of the ship and as required by the regulations of the United States Department of Commerce.

The main defense is that the defendant was free from fault and that the plaintiff's negligence was the sole cause of the accident and the resulting injury.

The jury, by a vote of nine to three, rendered a verdict in favor of the plaintiff for the sum of $10,000 damages for the injuries sustained and for $4,800 for maintenance and cure under his maritime contract. The district judge rendered judgment accordingly. The defendant appealed to the Court of Appeal for the Parish of Orleans. The plaintiff answered the appeal and asked for an increase in the award of damages. The Court of Appeal rendered judgment annulling the award of damages of $10,000 for injuries and dismissed the suit in that respect on the ground that the plaintiff had failed to prove that the defendant was in any way at fault. The court also annulled the award of $4,800 for maintenance and cure and remanded the case to the district court for further proceedings on the ground that the proof was insufficient to support the verdict of the jury. 195 So. 392.

The plaintiff, after the Court of Appeal denied his application for a rehearing, applied to this court for a writ of certiorari, which we granted, and, on reviewing the case, we held that the ruling of the trial court in excluding the ex parte reports of the Marine Inspectors as hearsay was correct, and that the Court of Appeal erroneously reversed the ruling of the trial court and considered those reports as evidence in determining whether or not the defendant was liable. We also differed with the Court of Appeal as to the manner of fixing and placing the costs of court upon the plaintiff. We remanded the case to the Court of Appeal to have it determine the correctness or incorrectness of the verdict of the jury upon the record, without taking into consideration the Maritime Inspectors' reports. We affirmed the judgment of the Court of Appeal in remanding the case to the trial court for ad-

ditional proof in support of the claim for maintenance and cure. 196 La. 541, 199 So. 635.

When the case was again considered in the Court of Appeal, the judges followed the instructions of this court and eliminated the Inspectors' reports, and, on the same evidence upon which the case was submitted to the jury, decided that the plaintiff had failed to establish wherein the defendant was guilty of negligence. 199 So. 680.

After the plaintiff's request for a rehearing was denied by the Court of Appeal, he again applied to this court for a writ of certiorari, which was granted and the case is now before us for review.

■ Counsel for the plaintiff, now relator, has asked in his brief that this court consider the question of whether or not the plaintiff is entitled to the award of $4,800 for maintenance and cure. In our original judgment, we affirmed the judgment of the Court of Appeal, which ordered the case remanded to the district court, so that the plaintiff might have another opportunity to introduce additional proof as to that claim. An application for a rehearing was denied by us on January 6, 1941, and, therefore, the judgment of this court became final on that score and we have no right to further consider that issue at this time.

On May 13, 1938, the plaintiff, while employed as first mate aboard the steamship West Tacock, which was returning to Beaumont, Texas, from a voyage to England, was ordered by the master of the ship, in accordance with the regulations of the United States Government, to fire the Lyle or line-carrying gun or cannon thereon, in drill practice. The ship was then about eighty miles south of the Southwest Pass. In obedience to these instructions, the plaintiff had the gun lashed to the deck of the ship with a 3½-inch hemp rope tied to a 4-inch water pipe. He then made, or caused to be made, a powder bag to contain the charge of black powder which was placed in the gun and the projectile was inserted in the barrel thereof. His first two attempts to fire the gun were unsuccessful because of difficulty with the primers, but after he tried the third time, the powder ignited and the gun fired. Due to concussion and recoil, the cannon kicked back and broke the 3½-inch rope lashing and hurtled backward across the deck striking an overlapping deck plate and breaking off one of the angle irons, which was connected to the gun's carriage, and then deflected to the point where the plaintiff was standing, striking and jamming his right leg and hip against the hatch with such force as to inflict painful and permanent bodily injuries. The gun finally landed twenty-eight feet away against some steam pipes on the portside of the vessel.

There are several charges of negligence against the owners of the ship with respect to failing to provide it with proper equipment and in furnishing it with defective appliances, but, after a review of the case, it is our view that the Court of Appeal in its original opinion, as well as in its subsequent judgment, correctly concluded that the plaintiff, with one exception, had failed to prove that the defendant was at fault in any of those respects.

There was a charge of negligence, which the plaintiff's attorney emphasized in the Court of Appeal on the second hearing and in this court in his application for the writ and in the argument of the case, i. e., that the defendant failed to comply with the mandatory regulations of the United States Department of Commerce to furnish powder bags of the proper dimensions filled with the proper amount of black powder to be kept on board the ship ·and ready for use in firing the Lyle gun in practice drill or in emergency.

This contention is predicated upon the following regulations of the United States Department of Commerce contained on pages 26 and 27 of the Fifty-second Supplement To General Rules and Regulations, issued June 18, 1935, found under the subject "Line-Throwing Appliances," which begins on page 23:

"Service recommendations: (a) Mounted type.—The following *precautions* and *procedure* are recommended for the use of mounted type line-carrying guns and equipment:

"1. Service powder charge *should be* about 5 ounces, and the powder bags *should be* furnished to the vessel containing not more than that quantity of black powder. Under extraordinary circumstances, 8 ounces may be used.

\*      \*      \*      \*      \*

"Drills. The master of a vessel equipped with a line-carrying gun *shall drill* his crew in its use and require it to be fired at least once in every 3 months, using one-half the usual charge of powder and any ordinary line of proper length. The service line *shall* not be used for drill purposes. Each drill *shall* be recorded in the ship's log book.

\*      \*      \*      \*      \*

"Placard instructions. A placard with instructions for using the gun apparatus, as practiced by the United States Coast Guard, *shall* be posted in the pilot house and engine room, and seamen's, firemen's and stewards' departments of every vessel required by law to carry such gun apparatus." (Italics ours.)

The defendant takes the position that the regulation as to the powder bags is merely a suggestion to ship owners and leaves it to their discretion as to whether or not they will follow the recommendations and that they are in no way compulsory. The plaintiff argues to the contrary. We will analyze these recommendations for the purpose of determining their true meaning:

To start with, the above-quoted paragraphs are found imbedded in the mandatory regulations of the Department with reference to furnishing the Lyle gun and its proper use aboard the ship. It will be noted that the word "precaution" is used. It means "previous action; proven foresight; care previously employed to prevent mischief or to secure good result;" or "a measure taken beforehand; an active foresight designed to ward off possible evil or secure good results." The word "procedure" is defined as "manner of proceeding or acting; a course or mode of action." The word "should" is the imperfect of the word "shall"; it is the preterit of the word "shall"; "should" is used as an auxiliary verb either in the

past tense or conditional present. Its synonym is "ought". Both of these words clearly imply obligation.

For definitions and interpretation of the word "precaution", see Webster's International Dictionary and the case of McKinney's Adm'x v. Cincinnati, N. O. & T. P. R. Co., 242 Ky. 167, 45 S.W.2d 1031, 1034. For definitions and interpretations of the word "should," see the same dictionary and the cases of Town of Edgewater v. Liebhardt, 32 Colo. 307, 76 P. 366, and Foresi v. Hudson Coal Company, 106 Pa.Super, 307, 161 A. 910.

When regulations provide that certain things should be done and they specify the manner of doing so, it necessarily means that that is the proper way to do them and failure to meet the requirements thereunder is certainly not the proper way to carry them out and constitutes a violation thereof. The making of the bags on board of the ship, and the filling of them with black powder by guess and as the occasion presented itself for use in the Lyle gun, is a poor substitute for bags of the proper dimensions containing black powder measured in accordance with the requirements of the regulations or recommendations of the Department. Clearly, compliance with the recommendations was a surer and safer way to carry them out and left nothing to conjecture, uncertainty, estimation or mere guess-work.

The Department of Commerce of the United States government, in issuing these service recommendations, certainly realized that in firing this type of gun there necessarily was risk and the very basis of the recommendations is to require that precaution and care commensurate with the hazard be exercised so that no one would be unnecessarily injured. It is our view that the above-quoted service recommendations are worded in such a manner that we cannot say they were merely suggestive and not binding upon the ship owners.

The Court of Appeal of the Parish of Orleans in the first and second hearing of the case apparently made a distinction between regulations and recommendations of the Department of Commerce, in determining whether or not the defendant ship owners were required to furnish powder bags of the right size, properly filled with black powder. It appears to us that it makes little difference whether the Department's rules are called regulations or recommendations, because, under either title, if the rules are stated in mandatory language, they must be obeyed and followed.

The next issue to be determined is whether or not the ship owners furnished the ship with powder bags filled with the proper amount of black powder to be used in firing the line-carrying or Lyle gun in drill practice and in emergency cases. The evidence is conclusive and it is not pretended by the defendant that the ship owners supplied such powder bags with the proper quantity of powder contained therein to be used in firing the Lyle gun. The testimony shows that the defendant provided the ship with one-pound cans of black powder and cloth out of which the bags could be made, that the bags were not made nor the powder placed therein until it was necessary to use the cannon

and that there was nothing on board the ship with which to measure the powder before placing it in the bags.

Captain Andrew A. Miranda, a Government Inspector and a witness for the defendant, testified under cross-examination as follows:

"Q. When you made an examination of the equipment of a ship, as a rule you see that they have bags in which the powder should be put? A. I always check that, yes.

"Q. Well, should it be necessary to make bags? A. Sometimes it is or buy them at the ship chandlery already made. Sometimes you make them aboard ship. I have done both.

"Q. If you were examining the ship you would require as part of the equipment that they should have these powder bags? A. Have some bags there.

"Q. And you think an inspector making that inspection should have required that? A. Yes, sir.

"Q. These bags are made to hold a certain amount of powder, aren't they? A. No, you can put more in them. You can make them longer. They are generally made about the same size, but you can make some longer and some shorter, but they are on an average to hold just a charge.

"Q. Can these bags be bought with just a certain amount of powder in them? I mean are they put up by the ship chandlers. A. I never bought any with powder in them. I have always seen the plain bag

and the mate or whoever is in charge fills the charges."

Under re-direct examination, he testified:

"Q. As long as the ship is equipped with material for the making of powder bags, that meets the regulations, does it not? A. Well, if I was making the inspections the mate would have to have some of these bags made up ready for use. I would require the mate to have some three or four bags anyhow made up ready for use, kept with the equipment.

"Q. That falls under the usual duties and supervision of the mate? A. Yes. The master is really the man, because he has the authority to tell the mate to do it or the second mate or the third mate or whoever he wants.

"Q. I believe you said on numerous occasions you have made powder bags yourself, is that right? A. Yes, sir.

"Q. I believe you said also it was the customary and usual practice to keep the powder separate from the bags while on the ship, is that right? A. Not to fill— I have always kept some bags filled, yes."

It is our opinion that the defendant failed to comply with the regulations which required it to furnish powder bags properly filled to be used in the firing of the Lyle gun.

Was the ship owners' failure to comply with these requirements of the United States Department of Commerce one of the proximate causes of or a contributory cause of the accident and the resulting injury sustained by the plaintiff?

The plaintiff was injured under the following circumstances: Upon being ordered by the master of the ship to fire the Lyle gun, the plaintiff directed two seamen to place the gun on the starboard side of the bridge deck and, with their assistance, lashed it to a four-inch water pipe with a new 3½-inch manila rope. As there were no powder bags aboard the vessel, the third mate furnished material with which to make one and one of the seamen helped the plaintiff to sew up the cloth in order to make a bag. There was no measure on board to determine the amount of powder to be placed in the bag. The plaintiff then emptied the balance of the contents of the powder can into the improvised bag which he then inserted into the barrel of the gun and placed the projectile on top of the charge. Due to the fact that the primers would bend or break out of the primer hole, he did not succeed in firing the gun until about the third attempt, when the powder exploded and the gun broke its lashings and catapulted backward across the deck, injuring the plaintiff as we have already stated.

While the plaintiff maintained throughout the trial that he properly made up the bag and placed in it the correct amount of powder of about 3½ ounces, the Court of Appeal, in both of its opinions, with and without the Inspectors' ex parte reports, found that the plaintiff was in error in stating that he had placed the proper amount of powder in the gun and that the accident was caused solely through his fault in placing too much powder in the charge used. The Court of Appeal concluded (in both of its opinions) that the failure of the ship owners to comply with the service recommendations of the Department was not the proximate cause of nor a contributory cause of the accident.

The plaintiff relies mainly upon two federal cases to show that under the circumstances herein, the defendant was at fault in failing to provide the equipment required by the regulations or recommendations of the Department and that its failure to comply with these requirements was the proximate cause or, at least, a contributory cause of the accident and the resulting injury to the plaintiff entitling him to recover damages therefor.

The first case is Socony-Vacuum Oil Company v. Smith, 305 U.S. 424, 59 S.Ct. 262, 266, 83 L.Ed. 265. In this case, the plaintiff was employed as an oiler on the defendant's vessel and received an injury from a fall in the engine room while on duty, due to a defective iron step. He had reported that the brace on the step had become loose about three weeks before he was injured and it had not been repaired. He stood on the step for the purpose of touching the bearing of the propeller shaft, in order to determine whether it was overheating and needed additional lubrication. In attempting to step down, his left foot struck the loose brace and he fell, causing the injury for which he claimed damages. The defense was that the plaintiff could stand on the floor of the engine room and reach the bearing without unnecessarily and voluntarily stepping upon the known defective step and, therefore, he had intentionally and deliberately chosen an un-

safe way to perform his work when his employer had furnished a safe way and that his right to recover was barred under the doctrine of assumption of risk.

The court held that the doctrine of assumption of risk and contributory negligence did not bar recovery in suits by seamen to recover damages under the Jones Act but that these matters could only be taken into consideration in mitigation of damages. The court affirmed the judgment holding that the ship owners had failed to provide the seaman or employee with a safe place in which to work or safe appliances with which to discharge his duties in spite of the fact that the seaman had elected to adopt an unsafe course when there was a safe way in which he might proceed to do his work. In reaching this conclusion, the court said:

"Here respondent was a seaman; he was on duty when injured; and there was no evidence that he acted in disobedience of orders. In the absence of any controlling or persuasive authority we look to the reason of the admiralty rule of assumption of risk in order to ascertain its appropriate limits. Many considerations which apply to the liability of a vessel or its owner to a seaman for the failure to provide safe appliances and a safe place to work are absent or are of little weight in the circumstances which attend shore employment, in relation to which the common law rules of assumption of risk and contributory negligence have been developed.

"The seaman, while on his vessel, is subject to the rigorous discipline of the sea and has little opportunity to appeal to

the protection from abuse of power which the law makes readily available to the landsman. His complaints to superior officers of unsafe working conditions not infrequently provoke harsh treatment. He cannot leave the vessel while at sea. Abandonment of it in port before his discharge, to avoid unnecessary dangers of employment, exposes him to the risk of loss of pay and to the penalties for desertion. In the performance of duty he is often under the necessity of making quick decisions with little opportunity or capacity to appraise the relative safety of alternative courses of action. Withal, seamen are the wards of the admiralty, whose traditional policy it has been to avoid, within reasonable limits, the application of rules of the common law which would affect them harshly because of the special circumstances attending their calling. The Arizona v. Anelich, supra, [298 U.S. 110], page 123, 56 S.Ct. [707], page 711 [80 L. Ed. 1075, 1081], and cases cited; Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. It is for this reason that remedial legislation for the benefit and protection of seamen has been liberally construed to attain that end.

\*     \*     \*     \*     \*

"Any rule of assumption of risk in admiralty, whatsoever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages. There being no defense of assumption of risk where the seaman is without opportunity to use a safe

appliance, it seems plain that his choice of a defective instead of a safe one, resulting in injury, does not differ in either the quality of the act or in its injurious consequences, in any practical way, from his correspondingly negligent use of a safe or an unsafe appliance, where its use has contributed to an injury resulting from a breach of duty by the owner. See The Wanderer, C.C., 20 F. 140; The Frank and Willie, D.C., 45 F. 494; John A. Roebling's Sons Co. v. Erickson, 2 Cir., 261 F. 986, 987; Storgard v. France & C. S. S. Corp., 2 Cir., 263 F. 545. In either case the seaman's negligence is a contributory cause of his injury, without which the ship owner would be liable to the full extent of the damage.

"The incongruity and practical embarrassments in the application of a rule that the negligence in the one case bars recovery, while that in the other only reduces the recoverable damages, are evident. The common law is consistent in holding that both contributory negligence and assumption of risk are defenses. But other considerations apart, it seems inconsistent, and an impracticable refinement, to apply the rule for which petitioner contends in a system of law which maintains the comparative negligence rule to the fullest extent. This was recognized in Olson v. Flavel [(D.C.) 13 Sawy. 232, 34 F. 477], supra, and The Julia Fowler [(D. C.) 49 F. 277], supra, where the choice by the seaman of an unsafe appliance was held not to bar recovery but to be a proper basis for a substantial reduction of damages because of the negligence of the

choice. In the Julia Fowler, supra, the eminent admiralty judge, Addison Brown, held that a seaman who had suffered injury through the deliberate use of a halliard known to be defectively spliced when a sound rope was available was entitled to recover, but with diminution of damages because of his negligence in using the unsafe rope.

"We think that the consistent development of the maritime law in conformity to its traditional policy of affording adequate protection to seaman through an exaction of a high degree of responsibility of owners for the seaworthiness of vessels and the safety of their appliances will be best served by applying the rule of comparative negligence, rather than that of assumption of risk, to the seaman who makes use of a defective appliance knowing that a safe one is available. * * *"

In the case of Armit v. Loveland et al., 3 Cir., 115 F.2d 308, 311, the plaintiff, with twenty-two years' experience as a seaman, was employed as chief engineer on board of the defendant's tugboat. He instituted the suit under the Jones Act to recover damages for personal injuries alleged to have been sustained through the negligence of his employer in failing to provide him a safe place within which to work or perform his duties. Upon going aboard, he noticed the engine was not equipped with splash plates which are placed on engines to prevent water and oil from being splashed about by the moving parts of the machinery. He requested that the superintendent in charge for the owners of the tug furnish splash plates or materials with

which to make them, but his request was refused. The feed line in the engine room sprang a leak causing water to spread over the floor plates and the plaintiff was called from his rest period for the purpose of making the repair, which was done by lantern light. The oil and water had been splashed over the treads of the ladder leading from the engine room to the deck and as the plaintiff ascended the ladder, he slipped and fell to the floor, was rendered unconscious, and sustained injury to his chest.

The Court of Appeal of the Third Circuit, in affirming the judgment of the district court, quoted at length from the case of Socony-Vacuum Oil Co. v. Smith, supra, and concluded that the defendant had failed to furnish the plaintiff with a safe place in which to perform his duties, even though there was no statute or regulation requiring ship owners to furnish splash plates. The court said: "While negligence has been variously defined, it has lately been authoritatively redefined as being 'any conduct, except conduct recklessly disregardful of the interest of others, which falls below the standard established by law for the protection of others against unreasonable risk of harm'. Restatement of the Law, Torts, § 282. A standard of conduct established by law with respect to employers of seamen is that they shall provide their employees wtih a safe place in which to work. See Socony-Vacuum Oil Company v. Smith, 305 U.S. 424, 428, 59 S.Ct. 262, 83 L.Ed. 265, where a trial court's instruction to the jury to the above effect was approved."

In the light of these two authorities, let us examine the facts in this case, and determine whether or not the evidence shows that the defendant was guilty of negligence which was one of the proximate causes or a contributory cause of the accident.

The evidence shows that after the Lyle gun was lashed into position for firing, the plaintiff and one of the seamen made a bag out of a piece of cloth that had been kept aboard the ship and then the plaintiff emptied the balance of the contents of a pound can of black powder into the bag, which was thereafter inserted in the barrel of the gun.

The plaintiff and two of the seamen, who corroborated him as witnesses, testified that the amount of powder poured into the bag was about 3½ or 4 ounces, but that they did not measure it, because there was no measure on board for that purpose. They were confident that not more than 4 ounces of powder was used in firing the gun and estimated the quantity that they put in the bag at that amount, because they were familiar with firing Lyle guns and knew about how much powder to place in the charge.

The Court of Appeal, in both of its opinions, concluded that the accident was caused by the plaintiff placing too large a quantity of powder in the bag which was used in firing the gun and, therefore, there was unusual and extraordinary recoil, which caused the gun and its carriage to break the lashings and catapult backward across the deck.

If the ship owners had furnished the vessel with a measure by which the number of ounces of powder to be put into the bag could have been accurately determined, or had it provided the ship with bags of powder containing the proper quantities for firing the cannon in drill practice and. in emergency cases, the plaintiff would not have had to run the hazard of guessing or approximating the quantity of powder placed in the bag used in firing the gun. The regulations required the defendant to furnish and supply the powder bags containing the proper quantity of black powder to be used by the officers and seamen in firing the gun and it clearly failed in this duty. The master of the ship ordered the plaintiff, as first mate, to fire the cannon and he was on duty carrying out his superior's instructions when hurt. He did not have the proper supplies with which to accurately prepare the powder charge or to load the gun and was thereby placed in a position, by the defendant's failure to meet the regulations, where he had to exercise his own judgment and discretion in carrying out a mandatory duty required by the regulations to fire the gun once every three months in drill practice and to comply with the captain's orders. The defendant knew that it was mandatory to have on board the ship a Lyle gun and to fire it in drill practice and in emergency, and that, in order to do so, it was necessary to place the proper powder charge therein. The defendant was also aware of the fact that the firing of the gun was a dangerous and hazardous undertaking even in the hands of well-informed, experienced and skillful seamen.

The mere fact that there is some testimony in the record tending to show that it was customary that the owner of the ship furnish the cloth out of which the bags were to be made and the black powder in one-pound cans and that the officers of the ship usually made up the powder bags and placed a proper charge therein is not sufficient to overcome the requirements of the rules and regulations of the Department of Commerce of the United States government. A custom, and particularly a slipshod one, is not a substitute for a well-founded regulation. Furthermore, it appears from the testimony of Captain Miranda, the defendant's witness, that if he had inspected the ship, he would have required that it have on board bags containing the proper amount of powder ready for use in the Lyle gun.

It is our opinion that the defendant's failure to furnish the proper powder bags containing the correct quantity of powder was one of the proximate causes of the accident and that the defendant is liable therefor.

A review of the evidence confirms the finding of the Court of Appeal that the plaintiff, an experienced first mate and master of a vessel for many years, was also guilty of negligence in placing too large a quantity of powder in the powder bag used in firing the gun and, therefore, his negligence was also one of the proximate causes or a contributory cause of the accident and his resulting injury. In short, the accident was the result of the joint and concurrent negligence of both parties litigant.

We shall now consider the quantum, taking into consideration that this case is controlled by the Jones Act, where the doctrine of comparative negligence is applicable and under which contributory negligence is not available as a defense to bar the plaintiff's right of action for damages, but is to be considered in mitigation of or in apportioning the damages in making the award. The Max Morris v. Curry et al., 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; The Max Morris, D.C., 24 F. 860; Olson v. Flavel, D.C., 13 Sawy. 232, 34 F. 477; Hansen v. The Julia Fowler, D.C., 49 F. 277.

The plaintiff was injured aboard the ship on Friday, May 13, 1938, at about 1 o'clock p. m. The vessel was then approximately eighty miles south of the mouth of the Mississippi River opposite the Southwest Pass. At about 8:50 p. m. that night, the plaintiff was transferred from the ship to a Coast Guard cutter and was brought to New Orleans and placed in the Marine Hospital on May 14, 1938, where he remained until November 16, 1938.

Dr. John D. Lane connected with the Marine Hospital, and who treated the injured man, testified that, with the aid of X-ray pictures, he diagnosed the case as a comminuted fracture (or a fracture where ends of bones have been damaged) of the middle third of the right femur (the bone that extends from the hip bone to the knee and connects the leg and the pelvis bones); dislocation of the right hip in the socket where the upper end of the femur bone fits into the pelvis; fracture of the acetabulum or the socket or cavity into which the head of the femur fits on the pelvis; fracture of the right pelvic bone or the bone which forms the pelvis on the right side and the one to which the femur is attached; and that there was also a marked displacement of the pubic bone and an inward displacement and overriding of the distal fragments of the femur bone. He also testified that plaintiff's right leg would be permanently shorter than the left and that this would cause the pelvis to tilt and place muscular imbalance on the body, which would tend to weaken the spine; that a built-up shoe would improve the shortening of the leg; that there was permanent impairment of his normal capacity for performing his duties as a first mate or master of a vessel; that because of the fractures his ability to stand for a great length of time was considerably impaired; and that he did not consider the plaintiff physically fit to carry on work which would require him to climb ladders and stand for a long period of time.

From November 16, 1938, when plaintiff was discharged as an inpatient from the Marine Hospital, to November 8, 1939, the date of the trial, he received treatment as an outpatient at the hospital.

The plaintiff had served in the capacities as master of a vessel and first mate for approximately fifteen years, was forty-six years of age at the time of the accident and had a life expectancy of 23.81 years. He was earning $240 per month and from the date he was injured to the date of the trial, he was unable to work. He is permanently injured and his earning capacity is permanently impaired.

After taking into consideration the nature of the plaintiff's injuries, his disability, loss of earnings and impairment of his earning capacity, and the doctrine of comparative negligence under which the court must consider the plaintiff's contributory negligence in dimunition of the damages, we have concluded that the sum of $7,000 would be a proper award. Ellis et al. v. Whitmeyer et al., La.App., Second Circuit, 183 So. 77; Coast S. S. Co. v. Brady, 5 Cir., 8 F.2d 16; Id., 269 U.S. 578, 46 S.Ct. 103, 70 L.Ed. 421; Hamilton v. Lee et al., La.App., 14 So. 249; Gray v. New Orleans Drydock & Shipbuilding Co., 146 La. 826, 84 So. 109; Nelson et ux. v. Vicksburg, S. & P. Ry. Co., 141 La. 475, 75 So. 212; Rochefort v. Teche Lines, Inc., et al., La.App., 186 So. 751; and Stough et ux. v. Young et al., La.App., 185 So. 476.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the Court of Appeal for the Parish of Orleans, setting aside the verdict of the jury and the judgment of the lower court, is annulled, and it is now ordered, adjudged and decreed that the verdict of the jury and the judgment of the district court is amended by reducing the amount of the damages awarded the plaintiff from the sum of $10,000 to the sum of $7,000, and, as thus amended the verdict of the jury and the judgment of the district court with respect to the item of damages for personal injuries is affirmed.

It is further ordered, adjudged and decreed that the judgment of the Court of Appeal annulling the verdict of the jury

and the judgment of the district court insofar as the item of $4,800 for maintenance and cure is concerned, and remanding the case to the district court for additional proof with reference thereto, is affirmed. The defendant is to pay all costs of the proceedings up to this point and any additional costs to await the final judgment of the district court.

O'NIELL, C. J., is of the opinion that the judgment of the Court of Appeal should be affirmed.

McCALEB, J., recused.