## COMMISSIONER OF INTERNAL REVENUE v. DUCKWITZ.

### No. 5010.

Circuit Court of Appeals, Seventh Circuit.

Feb. 9, 1934.

Pat Malloy, Asst. Atty. Gen., and J. Louis Monarch and J. P. Jackson, Sp. Assts. Atty. Gen., for petitioner.

J. C. Campbell, of Charles City, Iowa, for respondent.

Before EVANS, SPARKS, and FITZ HENRY, Circuit Judges.

EVANS, Circuit Judge.

Petitioner assessed respondent with a deficiency income tax for the taxable year 1919, the amount of which was based upon the sum he received through the liquidation of the Iowa-Burk Syndicate of which he was the owner of a beneficial interest. The propriety of the additional tax turns upon whether the syndicate was taxable as a corporation or as a trust.

A stipulation of facts tells the story of this venture.

In 1918, four men acquired an oil and gas lease of ten acres of land in Texas paying $2,000 therefor. As they did not have the $30,000 necessary to drill a well, the Iowa-Burk Syndicate was organized to raise the money. The value of the lease was set at $60,000, and a one-half interest was reserved by the original four men and the other half interest was conveyed in trust to three trustees (including two of the founders). They were to, and did in some instances, issue certificates of beneficial interests to the purchasers, which evidenced the holders' interests in the venture. The trust indenture (a very short instrument) provided that the trustees should act until sufficient funds were raised for the drilling of the well at which time a meeting was to be called to elect trustees who should hold office for a year. It is inferable that trustees were named pursuant to this provision, though the showing is not clear. Money so raised and not used for necessary cost of operation was to be returned to the purchasers. The trustees, under the indenture, were empowered to collect all money realized from the sale of the oil and, after paying expenses, to distribute the same. They had the authority to borrow money on the property and to develop it by drilling other wells with the money on hand, if they deemed it wise so to do. Their activities and their authority were limited to the aforesaid ten acres.

The certificate of interest recited the existence of the trust and purported to "grant, bargain, sell and assign * * * an undivided * * * interest in and to a certain gas and oil lease covering" the said ten acres. The stipulation states that there were some

transfers of interest by certificate holders in 1919, but that none was recorded on the syndicate's books; that it did not keep a "record on its books of all transfers of interest, although its books show some transfers."

Oil was discovered in June, 1919, and the lease was sold in the latter part of that year for $300,000, which sum, less about $40,000 held as a reserve fund, was distributed to the owners of beneficial interests in accordance with the amount of their holdings. This fund constitutes the liquidating dividends which the Government is seeking to impress with the tax.

Respondent, as well as all other holders of an interest, paid individual income tax on the liquidating dividends he received.

In 1925, assuming that the syndicate was an association and therefore taxable as a corporation, the Government assessed a deficiency tax of about $95,000.

The stipulation further recites:

"That the said Iowa-Burk Syndicate, after the sale of the oil lease as aforesaid, in the latter part of 1919, ceased to operate and has since ceased to function and has no assets or property whatever."

One book record in evidence discloses about 110 owners of beneficial interests (many of whom never possessed a formal certificate), and the records show twenty-three transfers of interest, several of them being transfers from the holders to the trustees.

Several of the holders of certificates testified before the Board. They emphasized the financial distress which most of them were experiencing. Two testified to negotiations with officials of the Government—first, before the sale of the lease when they say they were advised by a Mr. Wayne Johnson, Solicitor in the Bureau of Internal Revenue, that they might complete the sale of the lease for $300,000 without worrying about income taxes, because it was clear from the indenture of trust that they were a partnership and not taxable as a corporation; and second, when the trustees left the $30,000 of the syndicate's reserve fund in offer of compromise and the Government officials said they thought the compromise could be arranged and then never communicated with the parties until the lapse of about a half year. After refusal of the offer in compromise the trustees left the check with the Government to cover future adjustments, and it was not until a year later that the Government sent out the deficiency tax notices,

during which time the situation of some of the members had changed materially.

No evidence of any meeting (except in the instance of the determination to sell the lease) was shown, although it appeared that there were numerous discussions in Charles City, Iowa, in which the members freely participated. No officers were ever elected or by-laws passed.

It appears rather clearly that Mr. Wade, one of the founders and a trustee, was, by mutual consent, the trusted manager and developer of the properties, kept the books, paid the expenses, etc.

There were three wells sunk on the property, and drilling on the fourth was about to take place when the sale occurred. Individual members advanced the money for drilling the additional wells.

 The Board properly rejected all of respondent's contentions as to the running of the statute of limitations, the validity of section 280 (a, b) of the Revenue Act of 1926 (26 USCA § 1069 (a, b), and the estoppel of the Government because of careless and unofficial expression of opinion by the solicitor in the Bureau of Internal Revenue. The rulings of the Board on these matters are so obviously sound that we refrain from discussing them in detail.

The real controversy between the parties is over the holding of the Board to the effect that the syndicate was not taxable as an association, and thereby the ruling of the Commissioner was reversed.

The appeal presents a borderline case which turns on the existence of sufficient facts to support the findings of the Board of Tax Appeals. We quote therefrom.[1]

[1] "The respondent has determined that the entire lease was owned and operated by an association which is taxable as a corporation under the provisions of section 1 of the Revenue Act of 1918, and that the total gain from sale of the lease constituted income to such association. We think it is clear from the facts proved that at least an undivided one-half interest in the lease was, at all times, the property of the four original owners as tenants in common. Certainly the profit accruing to their one-half interest is taxable only to them as individuals and to that extent at least the respondent erred in his determination.

"Whether the owners of the other one-half interest were members of an association taxable as a corporation depends upon the character of the trust created, the powers and duties of the trustees and the nature and extent of the business, if any, carried on by them. Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949; and Burk-Waggoner Oil Association v. Hopkins, 269 U. S. 110, 46 S. Ct. 48, 70 L. Ed. 183.

"Whatever may have been in the minds of the owners of this lease when they executed the trust agreement, it is clear that they conveyed a one-half interest to Holden, Campbell and Wade, in trust,

If we read the evidence .and the trust agreement together it seems tolerably plain therefrom that a small group of people in Charles City, Iowa, planned a simple and inexpensive method of handling a small venture in Texas oil speculation.

A single tract of ten acres was the field of their operation. Nowhere was there a suggestion that the trustees or members contemplated any oil mining activities outside of this tract. Those who conceived the project planned that this local group, who were willing to back their hopes with a contribution sufficient to drill an oil well, should divide the profits. The contributions of each were so small that a conveyance of a fractional interest in the real estate would have been cumbersome and impractical. Confidence and trust in one of the members led to the deposit of money with him, which in many instances was paid without his giving the payer any written document whatever.

While not determinative of the question before us, it is interesting to note that the Court of Appeals for the Eighth Circuit in the case of Burnet v. Burns, 63 F.(2d) 313, held that the four original investors were, for purposes of taxation, tenants in common and not members of an association.

Under all the circumstances, we do not feel justified in disturbing the Board's finding that the interest which each investor took was an interest in the land and that they stood in the relation, each to the other, of tenants in common. In reaching this conclusion we are adhering to the rule previously announced by us in Tyson v. Commissioner, 54 F.(2d) 29, and Tyson et al. v. Commissioner, 68 F.(2d) 584, decided December 15, 1933, which makes the decision in each case turn on the facts of said case. In the case before us the facts were sufficient to support the Board's finding respecting action of the group and we therefore must accept it.

The order of the Board of Tax Appeals is

Affirmed.

*Rehearing denied March 16, 1934.

---

for the sole purpose of selling it and collecting the money therefor. The agreement provides, 'That the said trustees shall act as such until such time as sufficient funds are raised for the purpose of drilling and developing the said described property.' When this purpose had been fulfilled the duties of the trustees ceased and thereafter as provided in the agreement, ' * * * a meeting shall be called of *all of the parties* interested in said lease and the *owners thereof* shall elect trustees who shall hold office for one year or until their successors are elected.' These trustees were to have powers and duties, as stated in the last paragraph of the trust agreement, to collect money from the sale of oil and other sources, to borrow money on the lease and to develop the property by drilling wells thereon. * * * There is nothing in the record to show that such plans were ever carried out. There is positive testimony that no such meeting as described was ever held and that the trustees contemplated were never elected. Throughout the period of operation Wade acted as manager merely by common consent of the other owners. The testimony cited in the respondent's brief as showing that the property was managed by the trustees, consists entirely of legal conclusions and conflicting as it does with what we deem to be the proper interpretation of the trust instrument, will be given no weight.

"The estate of a trustee is always commensurate with the powers conferred by the trust instrument and the purpose to .be effectuated by it; or, in other words, the trustee takes exactly that quantity of interest which the purpose of the trust and its proper execution may require, and no more. The purpose of the trust having been executed, the trustee's estate ceases and title passes by operation of law to the *cestuis que trust.* * * * When all the property conveyed to the trustees was sold and the $30,000 required for development had been realized therefrom, the purpose of the trust was fulfilled, the trust ceased to exist, and both legal and equitable title to the interests sold vested in the purchasers, by operation of law and they became tenants in common with the other owners of the whole lease. In the absence of any partnership or other agreement their relation with each other depended solely upon their title."