Laramore, Judge,
delivered the opinion of the court:*
The plaintiff is before the court by virtue of a special jurisdictional act** authorizing the court to hear, determine, and render judgment on her claim for the value of certain jewelry and other effects which were brought by her into the United States from Germany in 1928 and were sold at a customs auction in 1931 for nonpayment of duty. At the outset it is observed that section 2 of the jurisdictional act contains the novel direction that sections 1492 and 2509 of title 28, United States Code, “shall be applicable to this Act.” Section 1492 of title 28 empowers the court “to report to either House of Congress on any bill referred to the court by such House”, and section 2509 directs that such *174 report to either House shall contain, in addition to the facts of the claim, “conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.” The plaintiff urges that the unorthodox language of the act means that the court is to render judgment on the merits of the claim on either a legal or equitable basis, but the act does not say this. A more logical construction would be that the court is to enter judgment for the plaintiff if the defendant is found to be legally liable, but if there is no legal liability then the court is to report to each House of Congress (since the bill initiating the act passed both Houses) any amounts equitably due the plaintiff, including the award of a gratuity if the facts persuade that sort of recommendation. In the past, Congress has had no difficulty in finding explicit language directing the court to exercise equitable jurisdiction if that was desired. See the special acts in Murphy v. United States, 35 Ct. Cl. 494, United States v. Weil, et al., 35 Ct. Cl. 42, Lamborn and Co. v. United States, 106 Ct. Cl. 703, and Burkhardt, et al. v. United States, 113 Ct. Cl. 115. The court cannot safely assume powers in excess of its standard jurisdiction in the absence of a clear and unambiguous mandate.
The plaintiff rests her case in general on the dual propositions that the property which was sold to satisfy customs duty was of a character properly exempt from duty, and that the sale was void because of material procedural defects. The defendant denies these contentions and maintains in addition that the plaintiff was not the owner of the property.
Turning to the plaintiff’s first premise, that the property was exempt from duty, this in turn rests on the theories that it was inherited, that it consisted of articles of personal adornment and household effects made exempt by statute, and that the defendant is estopped from claiming that the property was dutiable because the plaintiff had relied to her detriment on erroneous advice given her by American consular officials in Germany prior to importation of the property. Even if the defendant’s consular officials in Germany had so advised the plaintiff prior to her departure from *175 Germany, and this is indicated only by plaintiff’s unverifiable asseverations of oral conversations she bad in 1928 with the said officials, the defendant would not be estopped from repudiating the advice if it was in error. Utah Power & Light Co. v. United States, 243 U.S. 389,409; United States v. San Francisco, 310 U.S. 16, 31; Commissioner of Internal Revenue v. Duckwitz, 68 F. 2d 629; Fleming v. Miller, 47 Fed. Supp. 1004.
Inherited property is not, as plaintiff contends, exempt per se from duty under the law. The relevant “free list” of imports appears in Title II of the 1922 Tariff Act (42 Stat. 922-934) and does not even by indirection infer that inherited property or heirlooms are free of duty. It may be true that duties are primarily aimed at articles imported for sale (Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 686), that merchandise subject to duty is intended to embrace only merchandise in a commercial sense (United States v. Mattio, 17 F. 2d 879), and that doubts or ambiguities as to a tax should be resolved in favor of the importer (Erskine v. United States, 84 F. 2d 690, 691; United States v. Wigmore, 48 F. Supp. 250, 252), but rewriting the free list as plaintiff impliedly wants is the prerogative of Congress, not the court.
Paragraph 1695 of the 1922 Tariff Act (42 Stat. 932) exempted from duty “wearing apparel, articles of personal adormnent, toilet articles and similar personal effects of persons arriving in the United States,” and, in a proviso at the bottom of the paragraph, added “That up to but not exceeding $100 in value of articles acquired abroad by such residents of the United States for personal or household use or as souvenirs or curios, but not bought on commission or intended for sale, shall be admitted free of duty.” It is clear (if not plainly expressed) that the blanket exemption provided by the paragraph in question applies only to nonresidents temporarily sojourning in this country, and that returning United States residents are exempt only up to $100 in value of the imported articles they acquired abroad. United States v. Dessin, 13 Ct. Cust. App. 28; United States v. Mattio, 17 F. 2d 879, 880. The ancestrally related provisions of the 1909 and 1913 Tariff Acts have also been so *176 interpreted by the Court of Customs Appeals in Bradley Martin, Jr., v. United States, 1 Ct. Cust. App. 134, T.D. 31185; Bache v. United States, 4 Ct. Cust. App. 414, T.D. 33852, and Thompson v. United States, 5 Ct. Cust. App. 343, T.D. 34534. Astor v. Merritt, 111 U.S. 202, relied upon by plaintiff to show the contrary, interpreted section 2505 of the Revised Statutes of 1878, the “free list” of that day, which was substantially different from related provisions of the 1909, 1913 and 1922 Tariff Acts and so the authority is inapposite. The editor’s arrangement of par. 1798 (b) and (c) of section 201, Title 19, United States Code (1958), itself clearly demonstrates the scope of the exemption provided by the 1922 and succeeding Tariff Acts. The plaintiff would further read into the words “acquired abroad” as they are used in the proviso to the 1922 tariff paragraph cited above the restrictive meaning “purchased abroad”, but the term as used seems to cover acquisitions in general whether by purchase, gift, inheritance or otherwise. The method of acquisition is merely a circumstance which does not control the question of duty so far as the statute discloses. The statute says what it means, and no need exists for interpretation of the legislative intent where there is no ambiguity.
Among the items imported by the plaintiff’s late husband were an ornamental bronze jewel box, a gold-plated silver strainer, 'and nine gold-plated silver Mocha spoons, each of the latter containing an embedded small gold coin. Paragraph 1531, section 201, of the 1922 Tariff Act (42 Stat.. 925) exempted from duty “* * * usual and reasonable furniture, and similar household effects of persons or families from foreign countries if actually used 'abroad by them not less than one year, and not intended for any other person or persons, nor for sale.” Under an earlier version of this same provision which omitted the word “similar” (§ 2505 Revised Statutes, 2d. ed. 1878, p. 489) the Supreme Court ruled in Arthur v. Morgan, 112 U.S. 495, that a carriage in use abroad by its owner, an American citizen, for more than one year, was entitled to exemption from duty as being included in “household effects”. Although the earlier statute was slightly more liberal than the one under discussion, it nevertheless appears that spoons, strainers and jewel boxes *177 are readily classifiable as “usual and reasonable furniture, and similar household effects”. Article 382 of the Customs [Regulations extends the exemption to nationals as well as aliens, and also recites that “Households effects used abroad not less than one year in a family of which the importer was a member may 'be passed free of duty, although the importer did not own the effects at the time of use.” The household effects in question were in the family of Hr. von Kalinowski’s mother for a considerable period while he was presumably an in-dwelling member of that family. Obviously the duty levied on the spoons, strainer and jewel box was not sanctioned by the applicable law and regulations.
The second phase of plaintiff’s argument, that the sale of her property was void due to technical deficiencies, is of greater merit in part. This divides itself into the main charges that plaintiff relied to her detriment on defendant’s erroneous advice that she had three years from the date of importation in which to redeem the property and so the defendant is estopped from repudiating the advice, that constitutional due process was violated when the defendant sold the property to satisfy unpaid duty without giving the owner personal notification of the time and place of sale, and that the notice 'by publication did not comply with the Customs [Regulations of 1923. The first of these charges can be disposed of without reference to estoppel. In September 1929 the plaintiff admittedly knew that the time for her to redeem the property which had 'been imported the preceding November would soon expire, for at that time she requested the Commissioner of Customs to grant an extension, and an extension of six months to April 1930 was granted. In October 1930 another six months’ extension was granted to April 1931, pursuant to Dr. von Kalinowski’s letter requesting extra time and in which letter he also asked the Assistant Collector for his advice regarding information given him by a customs official to the effect that unclaimed parcels are sold after being held for three years. The record contains no evidence that the Assistant Collector ever responded to this inquiry 'by Dr. von Kalinowski for advice as to the three-year holding period, beyond merely granting another six months’ extension for redemption. The plaintiff would have the defendant estopped by its silence in not responding, *178 but this would not apply under either the facts or the law, as will be seen. In March 1931 the plaintiff requested still another six months’ extension and, in his letter to the plaintiff of April 8, 1931, granting an extension to October 8, 1931, the Assistant Collector of Customs put plaintiff on notice that “it will be impossible to extend this time any further.” It would be idle in the face of this exchange to hold that the plaintiff was gulled by the defendant’s failure to answer her husband’s inquiry of the preceding year regarding the applicability of a three-year holding period, or to believe that the plaintiff did not know that the property would be subject to sale after October 8, 1931, if it was not redeemed beforehand. At the very least, if she was in doubt she should have sought clarification, which she did not do.
The next point is more nettlesome. The plaintiff knew that auction sales of parcels on which duty was -unpaid were held in April and October of each year by the Customs Bureau. She knew that the property would be sold if she did not take steps by October 8,1931, to redeem it. But she had no actual knowledge of the time and place scheduled for the sale. On October 8, 15 and 22, 1931, there appeared in the New York Herald Tribune and the Journal of Commerce a notice that a public auction would be held on October 29, 1931, at which “unclaimed goods” would be sold. The notice explained that catalogs were available describing the goods to be sold, that the goods could be inspected at a certain time and place, but did not specify the items to be sold or the names of their owners. The plaintiff was at her home in Missouri and did not personally see the published notice in the New York papers. The plaintiff and the customs officials had engaged in frequent correspondence during the intervening years and the customs officials were aware of her address and of her anxiety to redeem the property.
The adequacy of the notice is in question. Section 491 of the Tariff Act of 1922 (42 Stat. 983) provides as to unclaimed goods:
If any merchandise of which possession has been taken by the collector shall remain in bonded warehouse or public store for one year without entry thereof having been made and the duties and charges thereon paid, such merchandise shall be appraised by the appraiser of *179 merchandise and sold by the collector at public auction as abandoned to the Government, under such regulations as the Secretary of the Treasury shall prescribe. * * *
Pursuant to this provision the Secretary of the Treasury promulgated Article 927 of the Customs Regulations of 1923, which read in part as follows:
When the name and address of the consignee can be ascertained from the manifest of the importing vessel, or otherwise, notice of the date of sale should be mailed to him. * * *
Implementing this article, Article 1072 of the Regulations prescribed a form for notice of sale to the importer. The world “should” as used in the quoted portion of Article 927 of the regulations is a loose and deceptive term. As a breeder of confusion this slippery little word has few peers. The cases disclose its meaning can be, depending on the context of its use, mandatory or directory, imperative or precative, obligatory or discretionary, must or may, and so it goes, a veritable Yin and Yang dichotomy. See Volume 39 of Words and Phrases, permanent edition, page 31, et seq. The party responsible for choosing an ambiguous word should rightly suffer the consequences of its obscurity. In Fegan, v. Lykes Bros. S.S. Co., 3 So. 2d, 632, 198 La. 312, where a regulation of the Department of Commerce relating to precautionary operation of certain line-carrying guns and equipment provided that the impelling charge “should” be of certain specifications and provided by the shipowner, the term “should” was held to impose a mandatory requirement of compliance and to be synonymous with “ought”, both of which words imply obligation. In other contexts the opposite has frequently been held, so that its meaning requires an analysis of its use in the individual case. In the instant situation if the term “should” as used in the regulation were to be construed so as to connote merely a discretionary performance little need is seen for the regulation, for without it the customs official in charge of the sale would still have authority, if he chose, to mail notices to owners whose property was scheduled for auction. It must be presumed that the regulation sought to accomplish something more than that which could occur permissively *180 in its absence. This view is fortified by the knowledge that Mullane v. Central Hanover Tr. Co.., 339 U.S. 306, might have the effect of imposing a constitutional due process requirement of actual rather than substituted notice to the owner under the present circumstances.
It is difficult to understand why the plaintiff, forewarned that she had until October 8, 1931, to redeem the property, did not as the time approached make further inquiries which may have elicited the details of the impending sale. “It is a general rule that whatever puts a person on inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty, and would lead to a knowledge of the facts by the exercise of ordinary intelligence and understanding.” 66 C.J.S. 642. On the other hand, it is well-established that, because the forfeiture of land to satisfy taxes is considered to be an extremely harsh measure, exact and strict compliance with the statutes must be had at the risk of the sale being void. Thatcher, et al., v. Powell, et al., Lessee, 6 Wheat. 111; Ronkendorff v. Taylor's Lessee, 4 Pet. 349. This philosophy has been held applicable to the forfeiture of imports not declared upon entering the United States (United States v. Mattio, supra). Customs duties are commonly held to be a form of tax (Brown v. State of Maryland, supra; Pacific Ins. Co. v. Soule, 7 Wall. 433). Logically, one can perceive no reason why the owner of chattels sold for nonpayment of customs duty is under any different or greater criterion of duty to inquire than the owner of land sold for nonpayment of taxes. The owner of property so fixed in situs as land should be even more aware of scheduled forfeiture sales than the owner of free-moving chattels. If tax titles are so notoriously fragile where the niceties of statutory prerequisites have not been observed, then a sale of chattels to satisfy unpaid customs duty should be equally vulnerable to procedural defects. The defendant’s failure to comply with the legal prerequisites to a sale thus had the necessary effect of invalidating the sale and exposing the defendant to liability for damages flowing naturally from the breach, presupposing the sovereign’s consent to be sued.
The final defense to liability is on the ground that the property in suit was owned by Dr. von Kalinowski and not *181 the plaintiff at the time of its detention and subsequent sale, so that the plaintiff is not the proper party in interest. The plaintiff counters this by making a general claim of ownership and, in the alternative, cites authorities to the effect that one who holds merely a right to possession of chattels can maintain an action in damages for their wrongful conversion. 150 A.L.B. 238; 53 Am. Jur. 924. Taking this to be a correct statement of the preponderant view so far as it goes, manifestly a plaintiff could recover no more than the value of his possessory interest. The plaintiff here seeks the total value of the articles allegedly converted, and has given no yardstick to measure the value of a mere possessory interest or usufruct.
However, the facts here support a gift inter vivos of the property by Dr. von Kalinowski to the plaintiff. All that is required to meet the test of a gift inter vivos is that the property be such as is subject to gift; that there be competent pai’ties donor and donee; that there be a donative intent; that there be delivery; that the gift be accepted by the donee.
As shown by finding 5, “On or about October 8, 1928, on the occasion of the distribution of the jewelry in question to Dr. von Kalinowski by the executor, Dr. von Kalinowski directed the executor to ‘Give them to her (meaning the plaintiff) . They are hers now.’ ” In addition, the articles were mostly women’s jewelry, and it was natural for Dr. von Kalinowski to give them to his wife.
The fact that Dr. von Kalinowski insured the articles of jewelry naming plaintiff as beneficiary also indicates that plaintiff was the owner. Furthermore, plaintiff was in possession of the articles at the time of the taking. The record discloses that the jewelry was in a small handbag carried by plaintiff when brought into the United States. The added fact that some later business matters relating to the jewelry were conducted by Dr. von Kalinowski is not of itself indicative of ownership in him. Dr. von Kalinowski and plaintiff were husband and wife, traveling together, and it was normal and natural that the husband, as head of the family, assume responsibility over such matters. We further suppose that this was a natural consequence of their German ancestry, inasmuch as the freedom of the wife in the transac *182 tion. of business affairs was not as prevalent in Germany as in the United States.
Thus we conclude from all the facts and circumstances in the case that all the necessary requisites for a valid gift have been shown, and plaintiff was the true owner of the jewelry in question.
There remains the question of damages. The task of determining the fair market value of the property in suit is complicated by the fact that the property is not available for physical appraisal. Findings 24 through 28 contain in detail the factors available for consideration in arriving at value. The plaintiff claimed a value of $66,000. It has been reasonably concluded and so found that the fair market value of the articles in suit was $8,125.72 as of October 1931 when they were sold at auction to satisfy unpaid customs duties.
Plaintiff is therefore entitled to recover the sum of $8,125.72, and judgment will be entered for plaintiff in that amount.
It is so ordered.
Dureee, Judge; MaddeN, Judge; and JoNes, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The instant suit was filed pursuant to the following Private Law 85-364, 85th Congress, approved March 15, 1958, conferring jurisdiction on the court:
AN ACT
Conferring jurisdiction upon the United States Court of Claims to hear, determine, and render judgment upon a certain claim of Mrs. Walter E. von Kalinowski.
Be it enacted by the Senate and House of Representatives of the United States of America m Congress assembled, That, notwithstanding any statute of limita *183 tions or lapse of time or any limitation upon tlie jurisdiction of the United States Court of Claims to hear, determine, and render judgment on claims against the United States, jurisdiction is hereby conferred upon the United States Court of Claims to hear, determine, and render judgment upon the claim of Mrs. Walter E. von Kalinowski. Suit upon such claim may be instituted by Mrs. Walter E. von Kalinowski at any time within three years after the date of enactment of this Act.
Seo. 2. The provisions of sections 1492 and 2509 of title 28, United States Code, shall be applicable to this
Approved March 15,1958.
2. The plaintiff is a citizen of the United States and is the widow of the late Dr. Walter E. von Kalinowski, who died October 12,1942, in New Orleans, Lousiana. Dr. von Kalin-owski was a naturalized American citizen since 1920, was a professor at various colleges in Missouri, Louisiana, and elsewhere, and resided permanently in New Orleans during the last four years of his life.
3. Dr. von Kalinowski’s German mother, Baronin von Kalinowski, had been a wealthy woman prior to the drastic inflation in post-World War I Germany. Her husband was a member of the German aristocracy.
4. Baronin von Kalinowski died testate at Wiesbaden, Germany, on April 8, 1928. She left various items of jewelry, silver and laces to her son, Dr. von Kalinowski. One of these items was a gold bracelet with diamonds in the shape of a star, which the plaintiff contends had been given to her by the Baronin prior to her death, and the defendant claims was bequeathed to Dr. von Kalinowski. While the Baronin had indicated an intention to will the bracelet to the plaintiff according to a letter in evidence written by her in 1919, the wiH itself was not in evidence. The bracelet appeared in the inventory of the Baronin’s estate. It must, therefore, be concluded that the bracelet was not given by the Baronin to the plaintiff but was bequeathed by her will to the late Dr. von Kalinowski along with other valuables.
5. In June 1928 Dr. von Kalinowski, accompanied by the plaintiff and their two minor sons, journeyed from the United States to Wiesbaden, Germany. The plaintiff con *184 tends, and tbe defendant denies, that Dr. von Kalinowski made a gift inter vivos to the plaintiff of the valuables he had inherited from the Baronin. On 6r about October 8, 1928, on the occasion of the distribution of the jewelry in question to Dr. von Kalinowski by the executor, Dr. von Kalinowski directed the executor to “Give them to her [meaning the plaintiff]. They are hers now.” In further support of the donative intent, Dr. von Kalinowski applied for and was issued on October 31,1928, a travel insurance policy, naming the plaintiff as beneficiary, covering the transportation of the von Kalinowski baggage and jewelry on the pending return voyage to the United States. The policy provided total insurance coverage of 42,000 marks, of which 40,000 applied to “diamonds and jewelry”.
6. In mid-October 1928 the plaintiff and her husband conferred with the American consuls in Frankfort and Berlin, and with the Special customs Agent in Berlin, for the purpose of ascertaining whether the jewelry was dutiable under the customs laws of the United States. They were informed orally that the jewelry would not be dutiable because it had been inherited and not purchased, and that it could be admitted duty-free to the United States as personal effects. Following these conferences a consular invoice was applied for on October 16, 1928, by Dr. von Kalinowski, and was issued by the American consul in Frankfurt on December 21, 1928. The declaration accompanying the invoice was prepared on a “merchandise not purchased” form, and was signed by Dr. von Kalinowski as “owner” of the property to which it pertained described as “articles of jewelry, gold, silver and laces”. The invoice stated that “These articles are inherited property of Professor Walter von Kalinowski from his mother who died in Wiesbaden, 8 April 1928 and who was Baronin Henrietta von Kalinow-ski, maiden name Pfaehler, Wiesbaden, Adolfsallee 31”. The invoice stated the value of the articles to be 8,434 marks.
7. On November 3,1928, Dr. von Kalinowski, accompanied by the plaintiff and their two children, embarked from Liverpool, England, arriving at New York on or about November 11, 1928. En route the jewelry and other valuables which he had inherited were left with the ship’s purser for *185 safekeeping, except for a ring which the plaintiff wore. It is not possible to determine from the record precisely what items were left by the Baronin’s estate to Dr. von Kalinowski and brought by him to the United States, but at least several items of jewelry so inherited and imported do not appear in the list in the succeeding finding 8. Also en route Dr. von Kalinowski made out a baggage declaration which declared a foreign value of 4,000 German marks for the jewelry and which, in accordance with custom, was collected before the ship docked and held for the use of the pier customs inspector assigned to inspect the declared baggage. The customs ofi-ciáis were fully aware, or should have been, that the property had been acquired by Dr. von Kalinowski by inheritance. The von Kalinowskis intended to retain the property for sentimental reasons as family heirlooms, and did not import them with an intention to sell them.
8. On arrival in New York the von Kalinowskis’ baggage was opened for customs inspection. Discussions were had by them with various customs officials, including the Assistant Collector of Customs, there being some question as to what extent, if any, the inherited jewelry and effects would be dutiable. The valuables which Dr. von Kalinowski had inherited from his mother were examined by the inspectors and appraised by an examiner in consultation with a jewelry expert. On November 15,1928, the customs officials released to the von Kalinowskis as duty-exempt a diamond brooch with matching earrings classified as “artistic believed to be over 100 years old”, which they had appraised for customs purposes at $1,000, and which same items had been appraised at 925 German marks in the Baronin’s estate inventory. The von Kalinowskis were given an opportunity to demonstrate, by affidavit or otherwise, that the other inherited valuables were duty-exempt antiques, but they were without specific knowledge as to the age of the items. At the same time the von Kalinowskis were given their collective personal exemptions and allowances totaling $465 for the family of four persons (consisting of $30 allowance for wear, $35 allowance for antique lace, and their $400 personal exemptions for which were released unidentifiable pieces of jewelry totaling that much in customs valuation), and the customs officials *186 held for payment of $640 customs duty (computed at 80 percent) the following items of “jewelry old and used” which had been appraised for customs at $800:

BeiohsmarJes

а. Man’s ring of entwined snakes, with diamond and emeralds.
б. Bing with five large and various small diamonds- 250
c. Marquise ring with four large diamonds, three sapphires, and small diamonds- 230
d. Bing with pearl, emerald and diamond- 400
e. Bing with three large diamonds, three rubles and small dia-monds_ 400
†. Cameo brooch with diamonds- 380
ff. Diamond brooch with white sapphire and eighty small diamonds _ 600
h. Gold bracelet with diamonds in shape of star_ 550
i. Jewel box, bronze and ivory miniature_ 10
j. Gold-plated silver strainer and nine gold-plated silver Mocha spoons, each with a gold coin inserted, all in a box_ 9
Jc. Coral necklace- 15
l. Pair earrings with two pearls, two large and six small diamonds _ 800
m. Two pieces of gold chain, one medal, one gold charm, three pearls, twelve small diamonds_ 3
The column of figures to the right of the foregoing schedule of items reflects the value, in then prevailing German marks, appearing in the original inventory of Baronin von Kalinowski’s estate as reported by the appraiser in Wies-baden, Germany, and is given here not as proof of value but as a possible indication of the value relationship among the various items. Item a in the enumeration was not in the Baronin’s estate, but was the property of Dr. von Kalinow-ski, having been willed to him by his father who died in 1905. The gold chain, charm and medal listed as part of item m in the above enumeration were not in the Baronin’s estate but were the personal effects of Dr. von Kalinowski.
9. The von Kalinowskis were unable to pay at that time the $640 duty on the held items, and they were deposited in Public Stores, which is a Government warehouse and not a bonded warehouse.
10. In March 1929 the U.S. Customs officials, pursuant to plaintiff’s request of the preceding month, authorized the plaintiff to manipulate the jewelry, i.e., remove the gems from their mounts and reenter the stones separate from the *187 mounts, which would have resulted in a substantial reduction of duty. The von Kalinowskis did not avail themselves of this opportunity, possibly because of the expense of dismounting and remounting, and the possibility of loss of the stones in the process.
11. On September 20,1929, the plaintiff wrote to the Commissioner of Customs that stringent financial circumstances prevented her from redeeming the jewelry detained since November 12, 1928, and that the period for its redemption would soon expire. She referred to the jewelry as family heirlooms of unknown antiquity inherited by her husband, made no explicit claim to the property as hers, and sought the Commissioner’s intervention to secure an equitable adjustment of the problem. By letter the following month to Dr. von Kalinowski the Customs Service gave him a six-months’ extension until April 1930 to redeem the jewelry by payment of the duty and informed him 'that the jewelry was being held in the U.S. Appraiser’s Warehouse.
12. In February 1930 the jewelry was transferred to the U.S. Customs Seizure Boom in Brooklyn, New York, in preparation for the ensuing spring auction of unclaimed parcels. At that time an Unclaimed Merchandise Tag was prepared, the front of which bore in part the following data:
1 pkg. 1 assortment jewelry old and used
80% 180000 225000
In the ordinary course of procedure followed in such situations, absent error, this would be an abbreviated form of stating that imported merchandise valued at $1,800 for customs purposes was to be sold for nonpayment of customs duty computed at 80 percent, and that the “domestic value” of the merchandise (which term was a meaningless fiction and was inserted simply because the regulations required it) was $2,250. On the reverse aside of the tag a sales employee of the customs service had written the following:
Jewelry old and used 80000
Jewelry artistic 0/100 $100000
$180000 *188 Except for the total, this information on the reverse side of the tag was taken from the original baggage declaration and meant that old and used jewelry appraised at $800 was subject to 80 percent duty, and that artistic jewelry over 100 years old appraised at $1,000 was exempt from duty. Through an apparent error the total of the two, $1,800, was transferred to the front of the form as seen above by an unknown clerk, thus making it appear as stated above that jewelry appraised at $1,800 was to be sold for nonpayment of 80 percent duty, whereas actually jewelry appraised at $800 was to be sold for nonpayment of the 80 percent duty amounting to $640. Normally the fictional “domestic value” was computed by adding 10 percent to the sum of the appraised value and the duty, a somewhat arbitrary procedure which, however, did no harm because the “domestic value” figure meant nothing either to the customs officials or knowledgeable bidders, even though it was the only value which appeared in the catalog announcing the sale. The fact that $1,800 happens to be 80 percent of $2,250 is merely a coincidence and does not aid in determining the cause for the error which was made.
The plaintiff contends that the foregoing sequence of events establishes the fact that the property in suit was reappraised in February 1930, and that the reappraisal was made without the owner’s knowledge, contrary to the requirement of regulations requiring notice, etc. There is in evidence as an admission against the defendant’s interest a letter from the Acting Secretary of the Treasury stating that the property was reappraised at $2,250. On balance, taking into consideration the record as a whole, it is reasonably concluded that the information appearing on the Unclaimed Merchandise Tag was the product of error and that there had been no reappraisal of the property in suit.
13. On September 30, 1930, Dr. von Ealinowski wrote to the Assistant Collector of Customs expressing his intention to redeem the jewelry as soon as he could and stating further;
While I was in Washington, I took occasion to look up the Commissioner of Customs, Mr. E'ble. Mr. E'ble was out of the city, but I had talk with Mr. Ashworth. I thought I might be able to obtain a little more in *189 formation about my own case. Mr. Ashworth told me that three years is the limit, before the Government sells what they called unclaimed parcels. In that case, I have still another year’s grace, as I did not bring these jewels into the country until November 12, 1928. Will you kindly advise me at once in regard to this matter ?
I will appreciate any extra time allowance you may grant me.
The reply of the Assistant Collector to the foregoing letter is not in the record, but it granted a further extension to April 1931 without commenting on Dr. von KalinowsM’s inquiry as to whether he had another year’s grace. Neither of the von Kalinowskis after receiving this incomplete response from the Assistant Collector made further inquiries as to the three year redemption period.
14. On March 19,1931, the plaintiff wrote to the Assistant Collector requesting another six months’ extension of time to redeem the parcel of jewelry on the grounds of inability to raise the required funds, and stating “I am aware that I have about exhausted your patience with persistent semiannual requests and my time limit to redeem the parcel of jewelry as well.” In his reply of April 8, 1931, the Assistant Collector stated to the plaintiff in part as follows:
This merchandise was long since transferred to the Seizure Room for sale as unclaimed. However, it has been withheld from such sale upon your request. This office will give you a further extension of six months from date of this letter in which to claim this jewelry. However, in view of the lapse of time since the articles were brought into the United States, it will be impossible to extend this time any further.
15. On October 16, 1931, the plaintiff conferred with a Mr. Nagel, who was her friend and a former cabinet member under President Taft, and enlisted his aid in obtaining either another time extension or other dispensation. In her letter to Mr. Nagel of that date she advised him that “The time limit of three years will expire on Nov. 12, coming * * It is concluded that the plaintiff was honestly confused as to whether she had three years from November 12, 1928, within which to redeem the jewelry, although she was aware that October 8, 1931, was the expiration date of the final six months’ extension which had been granted her *190 by the Assistant Collector in the preceding April. Hie plaintiff knew also that sales of unclaimed parcels were held in April and October of each year.
16. On October 8, 15 and 22, 1931, the following notice appeared in both the New York Herald Tribune and the Journal of Commerce:
Notice is hereby given that public auction of unclaimed goods will be held in the U.S. Customs Seizure Room, Army Base, 58th St. and 1st Ave., Brooklyn, on October 29, 1931, at 10 a.m. The goods may be seen from 9 to 3 on October 26 and 27. Catalogs will be mailed from the Seizure Room on October 22.
Philip EltiNG, Collector„
In 1931 the circulation of the New York Herald Tribune was 292,164 and that of the Journal of Commerce was 25,283. The population of New York City at that time was 6,930,446. No personal notice of the proposed sale was given to the von Kalinowskis, although the Customs officials were aware of their address.
17. Under the columnar heading “value” in the catalog announcing the sale appeared the amount $2,250, the significance of which is discussed in finding 12, supra. The catalog listed, inter alia,, in abbreviated form the items enumerated in finding 8, supra, except for item l in that enumeration, viz., pair earrings with two pearls, two large and six small diamonds. Prior to the sale this omission was discovered and was corrected by attaching to the page of the catalog used by the auctioneer at the sale a separate sheet itemizing the von Kalinowski jewelry including the earrings in question.
18. The auction sale was held as advertised on October 29, 1931, and the von Kalinowski jewelry was bid in by various purchasers for the following prices totaling $880:
а. Man’s ring of entwined snakes, with diamond and emeralds- $6. 00
б. Ring with five large and various small diamonds_ 40.00
c. Marquise ring with four large diamonds, three sapphires, and small diamonds_ 70.00
(L. King with pearl, emerald and diamond_ 15.00
e. Ring with three large diamonds, three rubies and small diamonds_ 20.00
*191 †. Cameo brooch with diamonds_$20.00
g. Diamond brooch with white sapphire and eighty small dia-monds_165. 00
h. Gold bracelet with diamonds in shape of star- 300.00
f. Jewel bos, bronze with ivory miniature- 5.00
j. Gold-plated silver strainer and nine gold-plated silver Mocha spoons, each with a gold coin inserted, all in a bos_ 42.00
7c. Coral necklace_ 15.00
7. Pair earrings with two pearls, two large and sis small dia-monds_160. 00
m. Two pieces of gold chain, one medal, one gold charm, three pearls, twelve small diamonds--— 22.00
The purchasers paid for and received delivery of their purchases on November 2, 1931. A net balance of $167.11 remained from the proceeds of sale after debiting the $640 in duty and $72.89 in expenses for storage, advertising and sale. According to defendant in its requested findings, this $167.11 balance is still due the estate of the late Dr. von Kalinowski and has never been demanded.
19. The plaintiff’s first actual knowledge of the October 29, 1931 sale came to her by means of a letter dated November 5, 1931, from her friend and representative, Mr. Nagel, who on November 2 (four days following the sale) had visited the Customs officials in New York on plaintiff’s behalf. In this letter Mr. Nagel informed the plaintiff that he had requested the officials to ascertain whether some of the pieces sold could be retrieved from the purchasers. Subsequent efforts made by the Customs officials in this direction were unsuccessful.
20. In his letter to the Customs officials of December 4, 1931, Mr. Nagel stated in part as follows:
The parties in interest had in mind the three year term, and thought they were within time when I called at your office. You were governed by the period of the last extension, copy of which I do not have before me. However that may be, I am rather surprised that notice of the proposed sale was not sent to the parties. They had manifested very keen interest in these articles, for reasons which are quite obvious. Although it may not have been necessary to advise them, it seems to me that such notice to them would have been only fair, and was *192 certainly advisable, inasmuch as the purpose must be to get the best possible prices at a sale. *5» ^
Finally, I doubt whether any of these articles were really subject to sale. I am given to understand that the authorities are not quite clear upon that subject, and under these circumstances it would have been particularly desirable to have the parties notified, in order that they might protect themselves and might have given the authorities the advantage of acting with the consent of the parties in interest.
I state my impressions because it does appear to me that the result is most unfortunate, and gives the parties in interest a perfectly natural cause for complaint.
What their course will be I do not know, because I undertook to represent them merely by way of friendly assistance, prepared to pay the whole duty when I came to your office, if that were necessary. I do not expect to represent them professionally, but shall ask them to consult their own counsel about the matter.
21. In succeeding years considerable correspondence passed between the plaintiff or others in her behalf and the Treasury Department in a continuing effort by the plaintiff to secure redress. The following selected excerpts from some of these letters disclose the warring contentions of the parties:
a. Letter of January 21, 1932, from Customs Service to Honorable Charles Nagel, replying to latter’s inquiry of December 4, 1931:
For your further information I quote as follows from Section 491 of the Tariff Act of 1930:
“Any merchandise of which possession has been taken by the collector which shall remain in bonded warehouse or public store for one year from the date of importation without entry thereof having been made and the duties and charges thereon paid * * * shall be appraised by the Appraiser of merchandise and sold by the Collector at public auction.”
You will note that the articles in question were legally disposed of under customs laws and frankly I cannot see how the parties in interest have any case for complaint as they were put on notice -that 'the time limit of extension was definitely fixed as of six months from April 8, 1931.
*193 b. Letter dated May 15, 1933, from Acting Commissioner of Customs to Honorable Jolm J. Cochran, Member of Congress from Missouri, who had written on behalf of Dr. von Kalinowski:
As you no doubt know the duty on merchandise entered for warehouse is not required to be paid at the time of entry but is collected at the time of the withdrawal of the merchandise from the warehouse, the warehouse period being three years, that is, the merchandise may be withdrawn at any time within three years from the date of importation for consumption upon payment of the duty and charges, or for exportation without payment of duty, etc.
Since an application had been made for the manipulation of the jewelry which, as heretofore indicated, would have required a warehouse entry and since the application for manipulation had been granted by the Bureau prior to Mr. Kalinowski’s visit to the Bureau, the warehouse period of three years from the date of importation was possibly mentioned at that time. sfc ;}i ifc
You are advised that all merchandise brought into the United States is dutiable unless exempted from duty under some provision of law. The Appraiser found the jewelry in question not to have been entitled to entry free of duty.
There is no provision of law or regulation which entitled an importer to personal notification of the sale of any merchandise brought in by him which merchandise has become unclaimed and abandoned to the Government because the importer fails to comply with the requirements of the law and regulations to secure release of the merchandise from customs. At the time of sale of the jewelry a brief notice of the time and place of such sale for three successive weeks immediately preceding the sale in two newspapers of extensive circulation published at the port was required. * * * *
The articles brought in by Mr. Kalinowski were sold under authority of Section 491 of the Tariff Act of 1922, the pertinent portion of which provides that if any merchandise of which possession has been taken by the Collector shall remain in bonded warehouse or public store for one year without entry thereof having been made and the duties and charges thereon paid, such mer *194 chandise shall be sold by the Collector at public auction as abandoned to the Government under such regulations as the Secretary of the Treasury shall prescribe. *****
The foregoing review of the case shows that Mr. Kalinowski was accorded every possible consideration
and that the jewelry was finally disposed of by the Government as directed in Section 491 of the Tariff Act of 1922.
The Bureau regrets that it is unable to now aid Mr. Kalinowski.
g. Letter dated July 18, 1933, from Acting Commissioner of Customs to Honorable John J. Cochran:
With respect to Mr. Kalinowski’s inquiry of how could it have been considered that he had abandoned the articles to the Government when he was in direct correspondence with the Customs office in New York during the entire period, and had expressed Ms intention of exporting the articles back to Germany rather than forfeit them to the Government, you are advised that because of Mr. Kalinowski’s failure to perform all the conditions required to secure the release of the merchandise, under Section 491 of the Tariff Act, the Collector was authorized and directed to sell the merchandise at public auction as abandoned to the Government. After the expiration of the one-year period, exportation of the articles in question was proMbited by Article 926 of the Customs Kegulations of 1923, except on payment of the duty and all charges and expenses. Entry for warehouse under any condition was also prohibited by Article 926.
The one-year period referred to in Section 491 of the Tariff Act, and the three-year period mentioned in Section 557 of the Tariff Act, have no connection. Section 491 is applicable to merchandise which has not been released from Customs because the importer fails to take the necessary action to secure such release. Section 557 provides for a proper entry at the customhouse for a specific purpose, namely, storage in a Customs bonded warehouse for a period not to exceed three years, with all of the privileges given by Section 557 attacliing. :Ji
Mr. Kalinowski again states that the articles were sold without notice to him; that he never received official notice from the Collector of Customs at New York of the intention to sell, or that the articles were sold. As *195 stated in the Bureau’s letter of May 15,1933, there is no provision of law or regulation which entitles an importer to personal notification of the sale of merchandise which has become subject to sale because of his failure to comply with the governing law and regulations. * * * * * -1= * #
With reference to your constituent’s observation concerning the tariff classification of various of the articles sold, it would appear that some of them might have been conditionally free of duty had proper claim been made on entry and appropriate proof furnished to show that the conditions for exemption from duty were satisfied. This is possibly true of the items referred to as 9 spoons, 1 strainer, and 1 medal. As no proper claim was filed, the conditionally exempt status of the articles, if it existed, does not affect the propriety of their sale.
Mr. Kalinowski’s objections to the dutiable status of jewelry with personal associations and inheritances raise a question of Congressional policy. All articles imported into the United States have a value for customs purposes and are subject to duty unless specifically exempted therefrom, and no free entry is provided for heirlooms as such, nor for jewelry imported under the circumstances of this case.
Tour constituent’s opinion that a bracelet was denied free entry as an artistic antiquity because of its value is in error. The age, the artistic merit, and compliance with the customs regulations are the sole requirements for the free entry of antique jewelry, and value has no bearing upon the matter.
d. Letter dated October 7, 1933, from Commissioner of Customs to Honorable John J. Cochran:
Mrs. Kalinowski asks that the statement of the Bureau in its letter addressed to you on July 18,1933, that “no free entry is provided for heirlooms as such” be explained. Neither the word “Heirlooms” nor its equivalent is used in the tariff laws, and it is accordingly impossible, under the law, to give consideration, in classifying articles for tariff purposes, to the fact that they may be heirlooms.
To further inform Mrs. Kalinowski, merchandise entered for warehouse is not held in the Appraiser’s warehouse or public store, but must be stored in a warehouse, designated by the importer, bonded for the storage of imported merchandise generally. The Appraiser’s warehouse or public store consists of premises owned pr leased by the Government for the storage of mer *196 chandise undergoing examination by the Appraiser, under seizure, or pending final release from Customs custody, or merchandise awaiting sale as unclaimed.
22. Since the rejection of plaintiff’s efforts to secure redress from the Customs Service as indicated in the preceding correspondence, the plaintiff continued in sporadic efforts to perfect her claim, culminating in her application for Congressional relief which resulted in the enactment of Private Law 85-364,85th Congress, quoted in finding 1, supra.
23. Dr. von Kalinowski, plaintiff’s husband, died intestate on October 12, 1942, at New Orleans, Louisiana, his last place of residence. There was no administration of his estate. He was survived by the plaintiff and her two sons, both of whom are attorneys at law and represented the plaintiff in the trial of this case.
VALUATION
24. Judicial notice is taken that the official exchange rate of the German reichsmark in United States currency averaged 23.9154 cents in April 1928, 23.8143 cents in November 1928, and 23.8234 cents in October 1931. These rates appear in Table 173 on page 671 of an official publication of the United States Board of Governors of The Federal [Reserve System entitled Banking and Monetary Statistics published in 1943. The monthly averages are based on daily currency quotations on the New York market as gathered by The Federal Reserve Bank of New York and reported to the Secretary of the Treasury, who published them weekly as Treasury Decisions (see T.D. 42692, 42704, 42724, 42736, 43028,43033,43049,43056,45173,45182,45195,45213,45230) [1]
25. In presenting valuation evidence as to the jewelry in suit, which was not available for physical appraisal for reasons heretofore explained, the plaintiff relied primarily on the testimony of two witnesses. The first witness was a *197 jewelry designer who drew sketches of each, individual piece of the missing jewelry. The sketches were based upon the recollection of the plaintiff and the descriptions of the jewelry as contained in such documents as the inventory of the Baronin von Kalinowski’s estate, early correspondence, the auction sale catalog, and certain other incomplete rec-ordations by the Customs Service. Although the Customs Service was aware that the plaintiff was anxious to redeem the jewelry and had granted several extensions for this to be done, it never recorded a detailed description of the jewelry in anticipation of a possible post-auction claim, as prudence might have dictated. The plaintiff’s second witness was an expert gemologist and jewelry appraiser who appraised the jewelry on the basis of the sketches, the plaintiff’s description, and other descriptions in the record, giving values for both 1931 and April 30, 1959. The appraiser assumed the gems to be genuine (conceded by the defendant), that the diamonds were average fair quality commercial white diamonds and not gem, or flawless, diamonds (the latter being 50 percent to 75 percent more valuable), and that the settings indicated an age of from 60 to 100 years so that his replacement cost estimates contemplated old-cut rather than new-cut stones, the latter being of greater value.
26. The composite table below shows as to each piece of jewelry, and as to the total, the appraised value as given in the inventory of Baronin von Kalinowski’s estate, its value declared by Dr. von Kalinowski on his arrival in New York in 1928, the amount for which it was sold at the Customs auction on October 29, 1931, and the retail replacement cost (synonymous with fair market value) estimated by plaintiff’s appraiser at trial both as of 1931 and April 30, 1959. Ketail replacement costs of jewelry in 1931 were about one-half of those in 1959. The retail replacement costs for 1959 in the table below as provided by plaintiff’s expert appraiser include a 10 percent Federal excise tax currently applicable to sales of jewelry, while those for 1931 do not since there was no such tax at that time. All replacement costs shown include a jeweler’s markup over his cost of 50 to 60 percent, which is in keeping with the trade custom.
*198 Item Baronin's estate valuation as of April 1928 Marks Dollars Declared value, 1928 Auction sale, 1931 Value per plaintiff's expert appraiser 1931 Apr. 30, 1959
а. Man’s ring of entwined snakes, with diamonds and emeralds[1].. $0.00
б. Ring with five large and various small diamonds. 250 59.79 40.00 [, 545.46 $10,000.00
c. Marquise ring with four large diamonds, three sapphires, and small diamonds.. 230 55.01 70.00 !, 181.82 18,000.00
d. Ring with pearl, emerald and diamond__ 400 95. 66 15.00 681.83 1,500.00
e. Ring with three large diamonds, three rubies and small diamonds.. 400 95. 66 20.00 !, 954. 55 6,600.00
/. Gameo brooch with diamonds...__ 380 90.88 20.00 500.00 1,100.00
g. Diamond brooch with white sapphire and eighty small diamonds.. 600 143.94 165.00 ¡,000.00 11,000.00
h. Gold bracelet with diamonds in shape of star... 550 131. 53 300.00 5,818.19 16,000.00
{. Jewel box, bronze and ivory miniature_ 10 2.39 5.00
j. Gold-plated silver strainer and nine gold-plated silver Mocha spoons, each with a gold coin inserted, all in a box. 2.15 42.00
I Coral necklace.. 3.69 15.00
l, Pair earrings with two pearls, two large and six small diamonds_ 900 215.24 100.00 1,590.91 3,600.00
m. Two pieces of gold chain, one medal, one gold charm, three pearls, twelve small diamonds.. .72 22.00
Totals.. 3,747 896.11 [2] 952.94 880.00 [3] 30,272.75 * 66,600.00
27. In finding a fair market value as of October 1931 for the plaintiff’s jewelry, etc., sold at auction in that month, *199 several factors have been considered along with the data in the above table, viz :
a. It will be noted that items b, <?, d, <?, /, g, h, and l, which plaintiff’s expert valued at $30,272.75 as of October 1931, realized a gross of $790 at the Customs auction, or only 2.61 percent of the appraisal by plaintiff’s expert. Appraisals by Customs for purposes of duty are extremely low, somewhat analogous to appraisals for inheritance or estate tax purposes where the taxpayer is given the benefit of a valuation substantially less than market value. Sales at auction are in the nature of distress sales and thus the prices brought are normally substantially less than market value. Judicial knowledge cannot be taken of the percentage less than market value either of property sold at auction or of the Customs appraisals, and the record does not provide such a figure. The valuations provided by plaintiff’s expert are deemed to be unrealistically high, due not to the expert’s lack of capacity or candor, but to Ms lack of opportunity to examine the jewelry.
b. There were released to the von Kalinowskis in November 1928 as antiques a brooch and earrings appraised by Customs at $1,000, but wMch had been appraised at 925 marks ($220.29 at the contemporaneous official exchange rate) in the German inventory of the Baronin’s estate, wMch, assuming the inventory appraisal to have been correct, would have represented an exchange ratio of $1.08 per mark for the purpose of that transaction. On the other hand the Customs officials had appraised at $800 those items held for sale wMch had been valued at 3,710 marks in the German inventory of the Baronin’s estate, which, again assuming the inventory appraisal to have been correct, would have represented an exchange ratio of $0.215 per mark. There is thus a basic and unexplained inconsistency in the disparate valuations given by Customs to that property wMch was sold at auction and that which was released to the von Kalinowskis as duty-free antiques. It is probably true that the valuations given in the German inventory of the Baronin’s estate were substantially low because quite commonly valuations given *200 for estate tax purposes are leniently low, but it could be fairly assumed that the separate valuations in the inventory bore a reasonably correct relationship to each other and were no further away from reality than the Customs appraisal prices on the one hand and the values fixed by the plaintiff’s expert witness on the other. It is obvious that the amounts received at auction were substantially below fair market value, but it is not worthy of credulity that the fair market value was 38 times that of the Customs appraisal, as plaintiff’s expertise would indicate. This is particularly true when consideration is given to the fact that, prior to leaving Germany to return to the United States in 1928 the plaintiff’s husband insured the same items for $9,525.72, the domestic equivalent of 40,000 German marks. It may be reasonably assumed that in procuring baggage insurance for the trip Dr. von Kalinowski fixed an insurance valuation at least equal to, and probably in excess of the fair market value of the items at that time. Since there were released to the von Kalinowskis by Customs agents upon their arrival in New York jewelry and laces in the total value of $1,400 as appraised by Customs, deducting this sum from $9,525.72 would leave $8,125.72 as the maximum value of the items which were sold by Customs for $880, according to the plaintiff’s admission as represented by the baggage insurance policy.
28. It is thus found that the fair market value of the items of personal property in suit which were sold at the auction sale in October 1931 for nonpayment of duty was, as of that time, $8,125.72. This figure includes the $167.11 stated in finding 18, supra, to be the net balance from the auction sale proceeds credited to Dr. von Kalinowski and never paid to or demanded by him or his heirs since.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of eight thousand, one hundred twenty-five dollars and seventy-two cents ($8,125.72).

Commissioner C. Murray Bernhardt at the direction of the court, prepared an opinion and a recommended conclusion of law in this case. Commissioner Bernhardt’s opinion is substantially adopted by the court, except as to the issue of ownership and the recommended conclusion of law.

Private Law 85-364, 72 Stat. A15.

 At all times pertinent to this case there was applicable the provisions of 40 Stat. 739, § 522 (31 U.S.C. 372) under which the Secretary of the Treasury was directed to issue proclamations fixing the conversion rates of foreign currencies for the purpose of the assessment and collection of duties on imported merchandise. The effect of the rates so fixed is discussed in Staedtler v. United States, 25 C.C.P.A. (Customs) 136 (T.D. 49255), which cites In support Hadden v. Merritt, 115 U.S. 25.

 This ring was not part of the Baronin's estate inventory.

 Converted from 4,000 marks @ $0.238234 per mark.

 No appraisals for items a, i,j, k and m. Note also that the 1931 appraisal is without Federal excise tax, since there was none at that time, while the 1959 appraisal includes 10 percent Federal excise tax.